**Jamar PHENIS, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 02–CF–536.

District of Columbia Court of Appeals.

Argued March 7, 2006.

Decided Oct. 5, 2006.

Margaret Anthony, Washington, DC, for appellant.

Chrisellen R. Kolb, Assistant United States Attorney, with whom Kenneth L. Wainstein, United States Attorney at the time the brief was filed, John R. Fisher, Assistant United States Attorney at the time the brief was filed, Roy W. McLeese III, Deborah L. Connor, and Emily A. Miller, Assistant United States Attorneys, were on the brief, for appellee.

Before RUIZ and GLICKMAN, Associate Judges, and SCHWELB,[*] Senior Judge.

RUIZ, Associate Judge:

Jamar Phenis[1] was convicted of arson (D.C.Code § 22–401),[2] malicious destruction of property (D.C.Code § 22–403),[3] and second degree cruelty to children (D.C.Code § 22–901).[4] He claims on appeal that the trial court should have *sua sponte* ordered a competency evaluation

---

[*] Judge Schwelb was an Associate Judge of this court at the time of argument. His status changed as of June 24, 2006 to Senior Judge.

1. On certain court documents, appellant spelled his name "Jmarr Phenious." We employ, however, the "Jamar Phenis" spelling used by both parties in their briefs and the court in all of the case captions.

2. Whoever shall maliciously burn or attempt to burn any dwelling, or house, barn, or stable adjoining thereto, or any store, barn, or outhouse, or any shop, office, stable, store, warehouse, or any other building, or any steamboat, vessel, canal boat, or other watercraft, or any railroad car, the property, in whole or in part, of another person, or any church, meetinghouse, schoolhouse, or any of the public buildings in the District, belonging to the United States or to the District of Columbia, shall suffer imprisonment for not less than 1 year nor more than 10 years.
D.C.Code § 22–401 (1996), recodified at D.C.Code § 22–301 (2001).

3. Whoever maliciously injures or breaks or destroys, or attempts to injure or break or destroy, by fire or otherwise, any public or private property, whether real or personal, not his or her own, of the value of $ 200 or more, shall be fined not more than $ 5,000 or shall be imprisoned for not more than 10 years, or both, and if the value of the property be less than $ 200 shall be fined not more than $ 1,000 or imprisoned for not more than 180 days, or both.
D.C.Code § 22–403 (1996), recodified at D.C.Code § 22–303 (2001).

4. A person commits the crime of cruelty to children in the second degree if that person intentionally, knowingly, or recklessly: (1) Maltreats a child or engages in conduct which causes a grave risk of bodily injury to a child....
... Any person convicted of cruelty to children in the second degree shall be fined not more than $10,000 or be imprisoned not more than 10 years, or both.

during trial; that the trial court erred in failing to conduct a *Frendak*[5] inquiry; that the trial court improperly precluded him from defending against the specific intent element of arson; that there was error in the arson jury instruction; that the trial court erred when it corrected appellant's illegal sentence; that appellant's convictions for malicious destruction of property and arson merge; and that there was insufficient evidence to support his convictions. We conclude there is no merit to these contentions except for the claim that the trial court should have conducted a *Frendak* hearing into the potential availability of an insanity defense. We therefore remand the case to the trial court to conduct such a hearing.

## I. Facts

On June 27, 2000, appellant and his mother, Ardis Phenis, lived in the Randle Hill apartment complex located at 3364 Sixth St. S.E. At around 5:00 p.m. that day, the property manager, Coral Satcher, directed the maintenance supervisor, Andre Spinner, and his maintenance assistance, Joseph Sharon, to go to appellant's apartment because a patio window had been broken. When the maintenance crew arrived, Ms. Phenis opened the door. Appellant and appellant's six year old niece, Nigeri Cooper, were in the apartment as well. The sliding glass patio window, which measured about three by seven feet, was broken, and had left shattered glass on the outside patio and inside the apartment. Appellant was sitting on the couch and he "was very upset, arguing with his mother" about "some money she spent of his." The maintenance crew overheard Ms. Phenis say that the real reason for his

anger was because she would not let his girlfriend stay in the apartment.

As Spinner stood on the balcony, appellant approached the stationary balcony window and started shaking it, saying "this one is going next." Appellant then went back inside the apartment and continued arguing with his mother. As the argument between them continued and escalated, appellant "got mad and kicked the living room table ... across the room." Spinner and Sharon decided to leave the apartment because they were both "nervous" about the situation.

Spinner and Sharon reported the altercation to Coral Satcher in the management office. About three to five minutes later, Ms. Phenis arrived at the management office. She was "hysterical" and asked Satcher to call the police because her son was "going off." Satcher called the police and then gave Ms. Phenis the telephone so that she could describe what was going on.

As Spinner and Sharon began walking back toward the apartment, they saw appellant "holding a chair in the air that was on fire" and watched him throw the large chair, a recliner, "off the balcony." The recliner landed on the sidewalk. Appellant did not say anything at the time or call out for assistance.

Shortly thereafter, appellant's 6–year old niece, Nigeri, ran out of the building. She was acting "nervously and scared" and was crying. The little girl said that "her uncle was going crazy, he was going off ... acting strange." She went to Satcher's office, where she again reported that her uncle had "gone crazy" and had "set the place on fire" with her doll inside.

Fire began shooting out from the balcony. Spinner and Sharon banged on resi-

D.C.Code § 22–901(b)(1) & (c)(2) (1996), recodified at D.C.Code § 22–1101(b)(1) & (c)(2) (2001)

5. *Frendak v. United States,* 408 A.2d 364 (D.C. 1979).

dents' doors telling them to exit and pulled the fire alarms. While Spinner and Sharon stood outside waiting for the police and fire departments to arrive, they saw appellant walk out of the building and head toward the exit of the complex. Appellant "wasn't in [a] hurry. He was walking at a slow pace." Appellant had not called for help nor had he reported the fire to the apartment manager's office.

Spinner and Sharon flagged down a passing police car, informed the police that appellant had started the fire, and pointed the officers in appellant's direction. The police stopped appellant at the entrance to the property.

Appellant was transported to the Seventh District police station and, after being read his *Miranda* rights, appellant gave a statement to an investigator for the fire department. In response to questioning about how the fire started, appellant stated "Well, I guess I did it.... I struck a couple of matches.... About maybe four, maybe two.... Yes, there was two matches.... I threw the first match on a pile of newspaper.... I threw [the second match] on the couch." When the investigator asked if that was how the fire started, appellant responded "Yes, but I feel it was an accident. But when I get the power I am going to do it right. The thing will—and I am not tripping."

At trial the government presented an expert in the field of fire and arson investigation. He concluded that the fire was "incendiary," meaning that it was deliberately set by a person who knows that a fire should not be set in a particular case. His opinion rested on several facts, including that there were two separate areas of origin to the fire (the recliner that appellant threw out of the apartment, which only had localized damage to the seat cushion, and the couch); there was a short time period before the fire spread (ruling out a smoldering event such as a cigarette); the witnesses' statements about what they saw before the fire started and the throwing of the recliner off the balcony; appellant's statement that he had used matches; and District of Columbia Fire Department Investigator Ruth Cade's finding that there were no other sources of fire in the living room or dining room. The expert ruled out gas leakage, an electrical problem, or any other accidental causes as the source of the fire. He also opined that the monetary amount of damage to the apartment and its contents "was well in excess of $25,000," and that the structural damage to the apartment alone was at least $10,000.

Appellant did not testify or present any witnesses. In closing argument, defense counsel argued that the fire was an accident that the defendant had unsuccessfully tried to put out.

## II. Appellant's Competence and Possible Insanity

Because the obligation to order a competency examination and conduct a *Frendak* inquiry is triggered by the specific circumstances of the individual case, *see Frendak*, 408 A.2d at 380, we set out the pre-trial, trial and sentencing proceedings in detail as they pertain to appellant's mental condition.

### A. Pretrial Proceedings

At presentment on July 7, 2000—nine days after the offense—Judge Harold Cushenberry granted the government's request that appellant be held without bond and referred for a forensic screening due to his unusual behavior at the time of arrest. That same day Dr. Lawrence Oliver, a clinical psychologist, conducted a thirty-minute competency examination of appellant in the District of Columbia Superior Court cellblock. Dr. Oliver's report

indicated that appellant had in the last year received inpatient treatment at St. Elizabeths Hospital, from August 23–September 1, 1999, when, according to appellant's recollection, he was there to detoxify from illicit drugs and alcohol, but he received no medications. The report noted that on June 28, 2000, the day after the charged offense occurred, appellant tested negative for cocaine, PCP, and opiates, but was not tested for cannabis or alcohol. Dr. Oliver observed that appellant's "judgment and insight were distorted by unrealistic thinking." For example, he "could not be dissuaded from the notion that his legal difficulties were minor because [he stated:] 'they'll let me go. They always do.'" In addition, "[d]espite past experience with the criminal justice system, Mr. Phenis was unable or unwilling to demonstrate even the most basic knowledge of the judicial process and the roles of various court officials." He was also unable to "demonstrate any knowledge of his plea options, rights and the concept of plea bargaining. He was unable or unwilling to retain simple explanations of these issues." Dr. Oliver concluded that "[i]n his current state, Mr. Phenis would be unlikely to work effectively with his defense attorney or to maintain proper decorum in a courtroom." Dr. Oliver was not able to determine if appellant's behavior during the interview was "the result of volitional characterological traits, mental illness, substance abuse, or some combination of these factors."

A court order, issued on July 12, 2000, instructed Dr. Oliver to conduct a complete competency examination of appellant at the mental health unit of the District of Columbia Jail. The examination was conducted on August 15, 2000, but lasted only five minutes because appellant refused to participate in the evaluation. Dr. Oliver's report stated:

> In fact, he refused to leave his cell and when asked the reason for his refusal to participate said only "I'm ready to return to society. They should give me bond. I don't want to talk to you about anything." Mr. Phenis spoke in a rapid and disjointed manner as he said this and then fell silent. Because he has refused to bathe for several weeks, his hair was matted and he had a strong and disagreeable smell. According to staff on the mental health unit, Mr. Phenis has refused to take any medications and has consistently refused to come to clinic, engage in any of the therapeutic activities on the unit, and refuses to speak to staff.... His condition has deteriorated from what it was when he was seen at court for a competency screening.

The report noted that appellant had been on the mental health unit of the District of Columbia Jail in connection with previous charges, when he was more cooperative and responded to medication. However, "since being placed on the unit again in early July of this year, he has refused all treatment." Consequently, Dr. Oliver concluded that "it is my opinion that Mr. Phenis is incompetent to stand trial because mental health factors impair his capacity to have a factual and rational understanding of the proceedings against him, render him unable to work in any effective manner with his attorney, and diminish his ability to behave with decorum in a courtroom."

On August 22, 2000, a probable cause hearing was held before Judge Noël Anketell Kramer, during which Metropolitan Police Officer Brandon Shafer,[6] who was

---

**6.** Officer Shafer witnessed the firefighters putting out the fire; detained appellant; interviewed witnesses at the scene, including appellant's mother and niece; transported ap-

one of the first officers to arrive on the scene, testified about his observation of the events of June 27, 2000, including appellant's behavior. Officer Shafer stated that appellant was acting "distant, uncooperative," "pretty erratic," and did not exhibit "normal behavior" as one would expect from a person whose apartment just burned down. He was rambling in his speech and moving his hands in the air. In the back of the car on the way to the station, appellant was singing show tunes. Once at the station, he had "calmed down somewhat from the scene," and was answering the questions "pretty straightforward," although he was rambling "somewhat." Officer Shafer also testified that appellant's niece told him that appellant was "acting crazy" before the fire started.

At the conclusion of the hearing, after finding probable cause, the court noted that appellant was "not competent" to stand trial, and therefore did not know whether a trial date should be set. Appellant's counsel said she anticipated that "eventually it is going to become a *Frendak* issue. I do think that is going to happen just from [what] I know about this case." The court responded, "[m]aybe a *Frendak* or *Alford,* or whatever. I don't know." The court ordered further evaluation of appellant on an inpatient basis at St. Elizabeths Hospital, with an updated competency report to be submitted by October 10, 2000.

On September 29, 2000, a report was issued stating that Dr. Mitchell Hugonnet, a staff psychologist at St. Elizabeths Hospital, had examined appellant and several determinations had been made at a "diagnostic staff conference." The report stated that appellant was competent to stand trial "by virtue of having a factual and rational understanding of the proceedings pending against him and being able to consult with counsel with a reasonable degree of rational understanding." Additionally, the report indicated that appellant had been diagnosed with "PCP [phencyclidine] dependence, PCP–Induced Psychotic Disorder, Alcohol Dependence and Personality Disorder NOS [not otherwise specified] with Antisocial Features." Significantly, the report stated that appellant was currently receiving the medications Haldol and Cogentin, and that "he should remain on medication pending trial to assure continued competency." With such medication, according to the report, appellant did not need to remain hospitalized.

On October 10, 2000, at a preliminary hearing before Judge Kramer, the court noted that appellant had been found competent to stand trial and inquired whether appellant was going to challenge the competency finding. Defense counsel stated that it would not be challenged and that appellant was "fine and cooperative and a different person," and that he "wanted very much to take his meds and was grateful when he was on them and he's cooperative and fine and easy to deal with." When discussing whether appellant should be held without bond, defense counsel stated that "the psychiatric circumstances that existed at the time of this offense, this alleged offense, do not, they don't exist anymore. Mr. Phenis is on medication, he is certainly in control of himself. He seems to be fine. The medical workers at St. Elizabeths indicated that he was not at risk of danger to himself or to others...." Continuing, defense counsel stated that she thought appellant had stopped taking his medication at the time of the incident, "and that may have led to all kinds of

---

pellant to the police station; and then observed at least part of appellant's interroga-

tion at the station.

problems, and I don't think that exists now.... He was relieved he was on the medication again and I think this is a different person...." Judge Kramer said she understood that, as a legal matter, defense counsel seemed to be arguing "kind of an NGI [not guilty by reason of insanity] defense ... that he did this because of this mental illness." Although defense counsel responded she was not asserting insanity "at [this] point," the court noted that that was the "thrust of [defense counsel's] argument...." At the request of defense counsel, the trial court allowed appellant to remain at St. Elizabeths, because "it's clear that he's benefitted from that," and that it was a good idea to "keep him competent."

On October 18, 2000, new counsel entered her appearance on behalf of appellant.

On January 3, 2001, a fourth competency report was issued by Dr. Mitchell Hugonnet at St. Elizabeths, which essentially repeated the findings of the report issued the previous September: that appellant "remain[ed] competent to stand trial by virtue of having a factual and rational understanding of the proceedings pending against him and being able to consult with counsel with a reasonable degree of rational understanding;" and that appellant had been diagnosed with "PCP Dependence, PCP–Induced Psychotic Disorder, Alcohol Dependence and Personality Disorder NOS with Antisocial Features." It stated that appellant was then taking the medication Mellaril, and that "he should remain on medication pending trial to assure continued competency." As before, the report concluded that, with medication, appellant did not need to remain hospitalized.

On January 5, 2001, a hearing was held before Judge Kramer at which Barbara McClinton, a representative of the Pretrial Services Intensive Supervision Program, was present. McClinton reported that she had evaluated appellant in October, when he was rejected from the intensive supervision program "due to the fact of comprehensive mental health issues that needed mental health, and extensive mental health supervision...." McClinton stated that she had concerns about putting appellant in intensive supervision because of his "mental health issues and the medication and the treatment which he needs to be compliant with to remain competent to stand trial." After extensive discussions about which sort of program would best ensure that appellant would continue to receive his medication and necessary treatment, the court released appellant from St. Elizabeths and placed him in a pretrial services intensive supervision program pending return of an indictment. While in the program, the court ordered that appellant be monitored for drugs and alcohol and that he participate in mental health treatment and continue to take his medication.

Appellant was indicted on April 4, 2001. On April 23, 2001, the third judge in the case, Judge John Campbell, issued a work-release order instructing appellant, again, to participate in the court ordered-drug treatment and alcohol testing, as well as mental health treatment and "medical compliance." However, on May 21, 2001, appellant was re-admitted to St. Elizabeths Hospital for treatment,[7] where he remained throughout trial.

At a status hearing before Judge Campbell on June 25, 2001, defense counsel asked the court to order a special "Criminal Responsibility Test" to assess appel-

---

7. Although it is not entirely clear, it appears appellant was ordered to be readmitted to St. Elizabeths by another judge in a different case.

lant's mental illness at the time of the offense:

> Your Honor, there is an issue. (Indiscernible) asked, and I have mentioned this to [the government], that since Mr. Phenious (phonetic) is still at St. Elizabeths because Judge Winston has not released him in her case, I have spoken with Doctor Ritchie and asked his opinion regarding whether or not Mr. Phenious had his mental illness at the time, not for an [N]GRI Screening but as a mitigating factor because the jury instructions in arson do speak to mitigating factors as a defense. And we are not asking for [N]GRI, but we do plan as a second defense—our first defense is that he did not do it. But at the same time, we also want to introduce evidence that he had mental illness at the time. And if the jury should think that his actions could have caused an arson [sic], then we would like them to also consider his mental illness as a mitigating factor. And Doctor Ritchie said in order to testify to that, he would have to conduct what he calls a Criminal Responsibility Test.

When government counsel expressed uncertainty whether it would go toward "mitigation under arson or it just goes to the standard insanity defense," defense counsel clarified that "my client does not wish to plead not guilty by reason of insanity, but he does wish to use it as a mitigating circumstance if necessary." The government did not oppose the productivity report, and the trial court ordered that it be prepared.

Judge Campbell, who was new to the case, asked whether a competency exam had been conducted, and why, and the government responded that "when the defendant was brought in, when he was presented and after he was arrested, his behavior seemed very inappropriate for the circumstances. For example, he was singing in the back of the police car. His behavior was—he seemed to be ... he had mental health issues and he just wasn't— he didn't seem to have a whole lot of control over those thoughts and was just generally behaving inappropriately at the time." [8]

On July 10, 2001, appellant filed a motion to suppress statements he made to police officers at the time of his arrest, arguing in part that he "was suffering from mental illness on that day to the extent that if affected adversely what he said to the police."

On July 16, 2001, the Forensic Inpatient Services Division of the District of Columbia Department of Mental Health wrote the court to ask that it be given more time to conduct the criminal responsibility examination. The letter indicated that appellant had been diagnosed with "Phencyclidine Dependence, In a Controlled Environment and Phencyclidine–Induced Psychotic Disorder, In Remission," and that he was receiving the medication Risperdal Concentrate.

While the results of the criminal responsibility exam were pending, the government and appellant filed, on July 21, 2001, a joint motion to convert the then-scheduled trial date to a status hearing, because "the parties have a good-faith basis to believe that the defendant may not have been on the date of the offense criminally responsible by reason of insanity...." Additionally, appellant filed a motion to late-file a notice of intent to use the insanity defense on July 23, 2001, stating that

---

**8.** It appears from the transcript that the court was trying to complete the criminal responsibility testing order and as defense counsel had already left the courtroom, the government proffered this information to enable the court to complete the form.

"both the Defense and the Government have learned additional information through discovery and investigation and it now appears to both sides that a stipulated not guilty by reason of insanity plea may be the appropriate disposition in this case. Further, [appellant] has decided that this is the way he would like to proceed."

On August 17, 2001, the Forensic Inpatient Services Division issued its productivity report to the trial court. The entirety of the report's conclusions follows:

> Dr. William Richie, a staff psychiatrist, recently examined Mr. Phenis and the following determinations were made at a diagnostic staff conference. On or about June 27, 2000, the date of the alleged offenses, he was not suffering from a mental disease or defect that substantially impaired his capacity to recognize the wrongfulness of his conduct or to conform his conduct to the requirements of the law.
>
> He has been diagnosed Phencyclidine–Induced Psychosis and Phencyclidine Dependence. He is currently receiving Risperdal Concentrate 2 mgs po q AM and 6 mgs po q HS. Further, Mr. Phenis should remain on medication pending trial to assure continued competency. However, he does not need to remain hospitalized.

The report did not detail the nature or extent of Dr. Ritchie's examination, did not mention whether he had reviewed the four previous reports submitted by Doctor Oliver and Dr. Hugonnet, and did not note the repeated history of appellant's acute deterioration when he did not comply with his medication regime. In a hearing conducted before Judge Campbell on August 24, 2001, the court accepted the report finding that appellant could be held criminally responsible for the charged offenses, over defense counsel's strong objections to the report. First, counsel explained that because appellant had tested negative for PCP when he was arrested, the doctor's conclusion that he was PCP-dependent and was suffering from PCP psychosis at the time of the offense "could not be correct." [9] Counsel also objected to the report's one-sentence unexplained conclusion that appellant did not meet the legal definition of insanity when the crime was committed. Continuing, defense counsel pointed out a number of documented facts in the course of the proceedings to date that called the report's diagnosis into serious question: 1) the people at the apartment building who called 911 said appellant was "actually crazy"; 2) another witness said appellant had "gone crazy"; 3) the police said he was acting crazy; 4) upon appellant's presentment, a competency exam was immediately requested by the government and ordered by the court; 5) appellant was ordered by the court to undergo inpatient extensive forensic examination for 60 days; 6) that examination concluded he was incompetent but had been made competent only with the use of medication; 7) while in jail, his condition deteriorated significantly, to the point where he was found incompetent again, and had to be sent back to the hospital because he was "so sick"; 8) after being put back on medication, he did well again.

The court mentioned during the hearing that defense counsel was "talking about an NGI plea," and counsel confirmed that she was referring to an insanity defense, although not necessary an NGI plea, stating:

> Well, Your Honor, I don't know that [government counsel] is looking at the

---

**9.** The judge responded that "psychological effects, psychiatric effects involving those drugs [remain] long after the last time he ever took the drug. So that doesn't really mean very much to me."

NGI plea. This is just another plea that I just discussed it again with my client. There was no agreement at all. But I believe we are going to have to go to trial and we would ask ... we are asking for a bifurcated trial.... First that he is not guilty because he—I've talked to him so many times, I don't even think I can let him plead guilty. And I did discuss a plea offer (indiscernible) possible plea this morning, but speaking with him and his mother again, he does not want to plead guilty at this time to anything and I'm not sure I can let him given what he's always told me that if the fire was started by the man with the mask (indiscernible). And so we are asking for a bifurcated trial. I will be filing an ex parte motion for an expert which we had discussed at the last hearing. There is substantial information and I strongly believe that a different expert would write a report and explain everything and come to—conclusion. And I also feel that it's a jury question whether or not I definitely want an expert, whether or not we have an expert that the jury would find that he was—

At that point, the court interjected that it was not the time to address matters regarding the structure of the trial, but that "counsel can file whatever papers counsel wishes."

Appellant's counsel requested that, notwithstanding the conclusion of the productivity report, appellant not be sent back to the jail pending trial, since the last time he was in jail his condition deteriorated and he "became incompetent again." Judge Campbell, in apparent agreement, ordered that he remain at St. Elizabeths.

On October 4, 2001, appellant appeared at a hearing before Judge Campbell and defense counsel informed the judge that appellant would like to plead guilty to the charge of malicious destruction of property, and, in exchange, the government would dismiss the other two charges, waive enhancement papers, and reserve the right to ask the trial court to hold appellant in jail pending sentencing. However, during the Rule 11 colloquy, when the trial court asked appellant about the specific events giving rise to the charges, he did not admit to intentionally or maliciously setting fire to his mother's apartment or its contents, but stated that the fire began accidentally when he threw a lit match at an ashtray as he was leaving the apartment. Appellant said he did not realize that the match missed the ashtray or that a fire had started until some time afterward, at which point he tried to put the fire out. Because appellant would not admit to the charged crime, the trial court did not allow him to enter the guilty plea. Defense counsel explained that she had discussed this matter with appellant "many, many times," but she never could predict what he would say in court; she explained that "we've been going round and round on this for the last two years," and that it was "a problem." She admitted that if the trial court could not accept his plea, then "we would have to try to go to trial." After further, unsuccessful efforts to secure the plea, the trial court and the parties eventually decided to set a trial date later that month, October 29, 2001. The trial court agreed, at defense counsel's request (since she "would want him to [be] competent again"), to send appellant back to St. Elizabeths pending trial.

The case went to trial before the fourth judge to be assigned to the case, Judge Thomas Motley, on January 3, 2002. Before the trial began, the court heard arguments on appellant's motion to suppress statements made at the time of arrest on the ground that they were involuntary. At the hearing, many questions were asked about appellant's demeanor at the time of

his arrest. The officer testified that appellant was singing in the back of the police transport car, and that at the time of the arrest, "he looked very incoherent. He had a glazed look over his eye" that was "consistent with someone who was a drug user." The officer initially thought, because of appellant's slurred speech, glazed eyes, and "very animated movements," that appellant was high on drugs at the time of his arrest.[10] The glazed look remained in his eye throughout his transport and questioning at the station.

When appellant was questioned at the station, he appeared coherent and did not display any sort of "irrational behavior," although he continued to gesture with his hands, his eyes were glazed over, and he sometimes muttered. The officer further testified that, after observing appellant at the suppression hearing, appellant still had that "distant, glazed look. Not as drastic as that particular day, but somewhat similar."

The trial judge noted that defense counsel's suppression argument seemed to hinge on appellant's mental condition, but that there was no evidence, other than the officer's observations, as to appellant's mental condition at the time of his arrest. In denying appellant's motion to suppress the statements, the judge noted that "there was a lot of talk about his mental state. And there was some testimony indicating that, in the words of counsel, the conduct was bizarre, singing in the squad car, the glazed look, et cetera. Those may be described as bizarre." Nonetheless, the judge continued, "I do not find any link that indicated that he was suffering from anything that the police knew about, took advantage of, or was coercive in that

sense. His bizarre conduct was described fully, but it was not such that you would think that the defendant did not understand ... what was going on." Later, the judge commented that "there is nothing to indicate that because of his mental condition that he did not make a knowing and intelligent waiver." The judge did not refer to the two times appellant was found incompetent to stand trial, on the first and sixth weeks after appellant's arrest on the day of the fire.

### B. The Trial

During jury selection, appellant was singing and swinging in his chair. On the first day of trial, he was instructed by the judge: "[y]ou are not to communicate with the jury by saying hi to them or waving to them, or speaking to them in some way because that's communication with the jurors. So you must not do that, saying good bye to them. So I'm admonishing you not to do that. Is that clear?" Appellant responded, "[y]es, sir."

Later the same day, however, during the government's direct examination of its first witness, the court noted at a bench conference that appellant was "talking to the jury right now just like he did before. He needs to be instructed. You can tell him that he is not supposed to be communicating with the jury. That is a form of testimony." The judge addressed appellant again, saying: "Every time there's a bench conference, you try to communicate to the jury by mouthing words to them or talking to them." Appellant responded that he was not talking to the jury, but to himself. The judge disagreed, saying "I have seen you do that. I want you—when [you] do that, I want you to turn in your

---

10. According to the officer, appellant was walking away from the scene, and when the police officer approached him "he kind of threw his hands in the air and said, what, what do you want? What do you want?" Appellant gestured with his hands in a manner that was inconsistent with what he was saying.

seat, because I don't want you appearing to communicate with them." Appellant again responded that he wasn't talking to them, but to himself. The judge asked if he could stop talking in a way that appears as if he was talking to the jury, and appellant said yes. The judge advised that, "[i]f you need to talk to yourself, do it silently like the rest of us." Appellant responded, "[o]kay."

## C. Sentencing

After the jury returned its verdict of guilty, appellant was sent back to St. Elizabeths pending sentencing. A hearing was conducted on January 29, 2002, so that defense counsel could be heard regarding St. Elizabeths request that appellant be transferred to the jail. Defense counsel asked to have an independent expert witness examine appellant to determine whether he had a mental illness, noting that appellant had "a long history of mental illness before this incident ever happened," and that he had spent time at a psychiatric hospital while he was in jail in North Carolina when he was eighteen or nineteen years old. Defense counsel explained that she wanted an independent expert because she did not agree with the government doctor's assessment that his mental illness was solely PCP-induced. The judge responded that "I may agree with you that he has mental illness. I may agree with you. Then the question is how best we can fashion this sentence to assist him." The judge ultimately determined, however, that an independent expert was not necessary, and instead ordered a mental-health examination of appellant to aid in sentencing to be conducted by the District's Forensic Services Administration.

On January 31, 2002, appellant was transferred from St. Elizabeths to the District of Columbia Jail's Mental Health Ward, where he was interviewed and eval-

uated for one hour and forty minutes on February 19 and 20, 2002. Dr. Janet Fay–Dumaine, who performed the evaluation, also reviewed all of appellant's files and interviewed defense counsel and the government attorney. Dr. Fay–Dumaine's report noted that the court had ordered a competency evaluation at the outset of the case, on July 7, 2000, the report of which "recommended further evaluation after determination of his need for mental health treatment and compliance with any recommended treatment." After admission to St. Elizabeths and further treatment, appellant was considered competent for trial as of September 29, 2000, and further hospitalization was not recommended. Upon his release from St. Elizabeths on January 5, 2001, his diagnosis was "Phencyclidine (PCP) Induced Psychotic Disorder, PCP and Alcohol Dependence, and Personality Disorder Not Otherwise Specified with Antisocial Features." The records from a follow-up mental health visit on May 1, 2001 indicated that appellant was "assessed to have loose associations of thought, auditory hallucinations, and delusions of persecution." Dr. Fay–Dumaine's report also noted that when appellant refused medication, his condition "did not improve" and that appellant was currently on two anti-psychotic drugs (Risperdal and Haldol) and one for related side effects (Cogentin). The report also noted that a June 27, 2000 criminal responsibility report "opined that Mr. Phenis was criminally responsible for the instant offense," but Dr. Fay–Dumaine did not offer her own view of appellant's mental condition at the time of the offense.

After a thorough examination of appellant's background and mental history, Dr. Fay–Dumaine concluded that appellant "has a long history of substance abuse and psychotic symptoms that appear to be secondary to the abuse of substances. He did not appear to be suffering from symptoms

of a major mental illness at the time of this evaluation. His history suggests a psychotic disorder induced by substance abuse, with a history of Antisocial Personality Disorder that predates his psychotic disorder." The report noted that appellant's condition worsens significantly when he is not on medication, and that he should continue to receive "intensive" mental health and substance abuse treatment.

At the sentencing hearing on March 20, 2002 before Judge Motley, defense counsel informed the court that she had spoken with a doctor at the jail who told her "they [the Jail] still have Mr. Phenis listed with schizophrenia as his diagnosis. And, I believe that's an informed part of this and his mental illness should be considered in the sentence." In his allocution, appellant said that he had been "hallucinating and intoxicated at the time of the fire." He said that he had been trying to help his mother pay bills and rent, "because my mother is sick and stuff, too. Like I'm sick. My mother's sick, too, a little bit." The judge ultimately recommended that appellant serve his time at the Federal Corrections Center in Butner, North Carolina, which has mental health facilities, "because of the mental health issues surrounding the case, and I do understand that there are some."

## III.

### A. *Competency to Stand Trial*

■ On appeal appellant argues that his bizarre behavior during trial should have prompted the trial court to stop the trial and order another competency evaluation, since "there was strong reason to believe that the defendant was not competent at that time because he could not conform his behavior to proper courtroom decorum or to consult rationally with his attorney."

■ "Where there is evidence raising a substantial doubt as to a defendant's competency to stand trial, the trial judge is under a constitutional duty to order a hearing sua sponte." *Holmes v. United States*, 407 A.2d 705, 706 (D.C.1979) (citing *Pate v. Robinson*, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966); *Clyburn v. United States*, 381 A.2d 260 (D.C.1977); *Hansford v. United States*, 124 U.S.App. D.C. 387, 365 F.2d 920 (1966); *Grennett v. United States*, 131 U.S.App. D.C. 202, 403 F.2d 928 (1968)). The test for determining competence to stand trial is whether a defendant has "sufficient present ability to rationally consult with his attorney and to factually understand the nature of the proceedings against him." *Clyburn*, 381 A.2d at 263 (citing *Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960)). This court's review of the trial court's determination of appellant's competency to stand trial, "is limited to an examination of whether the trial court abused its discretion, the exercise of which we will not lightly disturb." *Clyburn*, 381 A.2d at 263 (citing *Wesley v. United States*, 233 A.2d 514, 518 (1967); *United States v. Bradley*, 149 U.S.App. D.C. 405, 407–08, 463 F.2d 808, 810–11 (1972)). "Where, as here, no motion for commitment is made, the trial court is nevertheless obligated to make or compel inquiry if it is in receipt of information which raises a bona fide doubt of defendant's competence." *Clyburn*, 381 A.2d at 263 (citing *Pate*, 383 U.S. 375, 86 S.Ct. 836). A court's decision whether to hold a competency hearing in the absence of a request for one is similarly reviewed for abuse of discretion. *See Lopez v. United States*, 373 A.2d 882, 884 (D.C.1977).

Appellant's behavior during trial, although bizarre and inappropriate in a courtroom, was not such that it must have raised a "substantial doubt" in the trial court's mind as to his ability to rationally consult with his attorney and to understand the nature of the trial proceedings.

The trial court reasonably could have found otherwise, having received two competency evaluations finding appellant competent to stand trial and heard defense counsel say appellant was cooperative once he was under a supervised medication program—as he was during trial—and observed appellant interact with counsel in the courtroom. *See Clyburn*, 381 A.2d at 262. The federal appellate court in this jurisdiction has previously found an abuse of discretion in failing to order, *sua sponte*, a competency examination only where the defendant's conduct was much more indicative of incompetency than here.[11] For example, in *Pouncey v. United States*, 121 U.S.App. D.C. 264, 266, 349 F.2d 699, 701 (1965), although the defendant had been found competent to stand trial, during trial he twice accused his attorney of conspiring with the government to send him to jail; testimony revealed that appellant had a habit of distrusting his attorneys; after testifying once, the defendant requested to retake the witness stand, and after doing so, stated to the jury "Plead me guilty to the charge." The court concluded that this behavior provided sufficient indications that the defendant was not able to consult rationally with his attorney or understand the impact of his actions on the outcome of the trial, and, therefore, that the trial judge should have ordered another competency examination. *See id.*, 349 F.2d at 701. In contrast, in *Lopez*, we concluded there was no abuse of discretion when the trial court failed to *sua sponte* order a third competency evaluation after two unopposed psychiatric reports assured the appellant's competency to stand trial,

despite appellant's "obstreperous behavior" during trial and his initial adamant refusal to be represented by an attorney. 373 A.2d at 884.

In this case, the judge had received before trial, two uncontested psychiatric examinations affirming appellant's competency, heard defense counsel's repeated assertions to the trial court that once appellant began taking his medications, he was cooperative and able to assist her, and ordered his placement at St. Elizabeths in order to assure his continued competency due to their close monitoring of his medication. Although appellant displayed somewhat disruptive behavior in the courtroom and seemed to be attempting to communicate with the jurors, drawing rebukes from the judge, it appears that eventually he was able to conform his behavior to proper courtroom decorum. Moreover, the transcript indicates that appellant was consulting with his attorney and seemed to be assisting her during the course of his defense, as evidenced by his participation in the voir dire of jurors, the decision to stipulate to the value of the damaged property, and the *Boyd*[12] inquiry into appellant's decision not to testify. Thus, it appears from the record that appellant was able to rationally consult with his attorney and understand the nature of the proceedings against him, notwithstanding some inappropriate behavior in the courtroom. We therefore conclude that the trial court did not abuse its discretion in failing, *sua sponte*, to order another competency evaluation during trial.

11. In addition, many of our cases have dealt with situations where no previous competency evaluation has been performed and no indications of mental illness have been demonstrated prior to appellant's bizarre behavior at trial. *See, e.g., Holmes*, 407 A.2d at 706–07 (finding insufficient indications of incompetency where defendant smiled strangely during trial and a marijuana pipe was taken from him); *Clyburn*, 381 A.2d at 262–63 (noting that the brutality of the crime is insufficient to raise issue of defendant's competency).

12. *Boyd v. United States*, 586 A.2d 670, 674–75 (D.C.1991).

### 2. *Frendak Inquiry*

Separate from the issue of competence to stand trial, "[w]henever ... evidence suggests a substantial question of the defendant's sanity at the time of the offense, the trial judge must conduct an inquiry designed to assure that the defendant has been fully informed of the alternatives available, comprehends the consequences of failing to assert an insanity defense, and freely chooses to raise or waive the defense." *Springs v. United States*, 614 A.2d 1, 10 (D.C.1992) (citing *Frendak v. United States*, 408 A.2d 364, 380 (D.C.1979)). Appellant argues that his history of mental problems and his behavior during trial should have prompted the trial court to conduct such a inquiry in his case.

In *Frendak*, the jury convicted the defendant of first-degree murder and carrying a pistol without a license. 408 A.2d at 366. Troubled by evidence at the competency hearings and at trial, the trial court *sua sponte* conducted an inquiry into the defendant's sanity at the time of the crime, eventually interposing, over defendant's objection, an insanity defense at a second, insanity phase of the trial—without conducting an inquiry into whether the object-

ing defendant had voluntarily and intelligently waived the insanity defense. *See id.* We remanded for such a determination, ruling that the trial court has discretion to interpose an insanity defense over a defendant's objection, but only if the court is convinced, after proper inquiry, that the defendant has not made, and cannot make, such a voluntary and intelligent decision. *See id.* at 380–81.

*Frendak* instructed trial courts to make a three-part inquiry whenever the defendant's mental condition at the times of the trial and the crime, respectively, is at issue: (1) whether the defendant is presently competent to stand trial; (2) if so, whether based on present mental capacity, the defendant can intelligently and voluntarily waive the insanity defense and has done so;[13] or, if not, (3) whether the court *sua sponte* should impose the insanity defense based on evidence of the defendant's mental condition at the time of the alleged crime. *See Anderson v. Sorrell*, 481 A.2d 766, 769 (D.C.1984) (summarizing *Frendak*). As to the second prong of the inquiry, now commonly called a "*Frendak* inquiry*." The court specified that "[t]he scope of the inquiry ... will vary accord-

---

**13.** The Supreme Court has rejected "the notion that competence to plead guilty or to waive the right to counsel must be measured by a standard that is higher than (or even different from)" the standard for competency to stand trial. *Godinez v. Moran*, 509 U.S. 389, 398, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993) (referring to the standard in *Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960)). The Court has recognized, however, that

> A finding that a defendant is competent to stand trial, however, is not all that is necessary before he may be permitted to plead guilty or waive his right to counsel. In addition to determining that a defendant who seeks to plead guilty or waive counsel is competent, a trial court must satisfy itself that the waiver of his constitutional rights is

knowing and voluntary. In this sense, there *is* a "heightened" standard for pleading guilty and for waiving the right to counsel, but it is not a heightened standard of *competence.*

*Id.* at 400–01, 113 S.Ct. 2680. (internal citations omitted) "The focus of the competency inquiry is the defendant's mental *capacity;* the question is whether he has the *ability* to understand the proceedings. The purpose of the 'knowing and voluntary' inquiry, by contrast, is to determine whether the defendant actually *does* understand the significance and consequences of a particular decision and whether the decision is uncoerced." *Id.* at 402 n. 12, 80 S.Ct. 788 (internal citations omitted). This additional issue is addressed by the *Frendak* inquiry. *See* 408 A.2d at 378.

ing to the circumstances present in each case...." *Frendak,* 408 A.2d at 380.

Although *Frendak* precludes the trial court from interposing an insanity defense when a defendant has the capacity to waive it and does so, *Frendak* also reaffirms the trial court's responsibility to assert such a defense "whenever the evidence suggests a substantial question of the defendant's sanity at the time of the crime," and the defendant not only fails to assert the defense but also is incapable of making a voluntary and intelligent decision to waive it. *Briggs v. United States,* 525 A.2d 583, 592 (D.C.1987). In this sense, *Frendak* is concerned not only with appellant's sanity at the time of the crime, but also with appellant's capacity at the time of trial to recognize the availability of the defense and whatever advantages—as well as disadvantages—it may offer to defendant's case. *See id.* at 592. The *Frendak* inquiry seeks to ensure that a defendant knowingly and intelligently waives his right to assert an available insanity defense. *See Frendak,* 408 A.2d at 379.

The quantum and nature of evidence that will trigger the obligation to conduct a *Frendak* inquiry is necessarily highly fact-bound and varies from case to case. In *Briggs,* for example, evidence at competency proceedings raised serious questions about the defendant's competency to stand trial but did not include expert opinion on productivity, and the defendant stated he would not plead insanity and refused to cooperate with a productivity examination. 525 A.2d at 592. The defendant in *Briggs* had three times been determined incompetent to stand trial; one of his treating doctors recommended that he be hospitalized; and they reported that he presented signs that he suffered from paranoid schizophrenia. *Id.* at 585–88. The defendant, who appeared *pro se,* contested his incompetency determinations, while sub-

mitting several pleadings to the court which contained unusual drawings and biblical references. *Id.* at 584–85. The defendant finally agreed to be represented by counsel, and was found competent to stand trial. *Id.* at 587.

At a status hearing, defense counsel suggested the possibility of asserting an insanity defense, but said that it was unlikely. *Id.* Before trial, the defendant continued his "illustrated correspondence to the court with an increasing number of biblical references...." *Id.* During voir dire, defense counsel communicated to the court his client's insistence that the only relevant defense question for prospective jurors was "whether they believed Christ ascended in the spirit or in the flesh." *Id.* When called to the stand, the defendant refused to swear or affirm he would tell the truth, stating in front of the jury: "I can't swear and I cannot confirm and Jesus Christ died for these sins that I may have committed.... Under the law of God no man is justified under the law doing anything and therefore there be no need to take the stand." *Id.* at 589. After the jury was excused, the defendant addressed the court, saying: "I told my attorney he could call me and we would see what we could see ... [But] I cannot testify to anything, Your Honor. What can I testify to?" *Id.*

In *Briggs* we held that the trial court should have conducted the *Frendak* inquiry where "the trial court itself expressed concerns about productivity based on bizarre pretrial behavior, where competency examinations indicated classic, long-term mental illness, and where appellant has resisted every inquiry into a possible insanity defense...." *Id.* at 593. We reversed the conviction, concluding that the trial court abused its discretion in failing to pursue the issue of insanity "without making a *Frendak* inquiry and taking

whatever [further] steps became necessary as a consequence." *Id.*

More recently, in *Patton v. United States*, 782 A.2d 305, 311 (D.C.2001), we held that even though pre-trial competency reports indicated the defendant was competent to stand trial and not then suffering from a mental illness, once the issue of the defendant's mental health was called into question during sentencing the trial court should have, at that time, conducted a *Frendak* inquiry. Supporting this conclusion were several factors, including: 1) the defendant's bizarre behavior soon after the crime as observed by the investigating detectives and the officers at the District of Columbia Jail, and as exhibited in court at the preliminary hearing and on the first day of trial; 2) the defendant's desire (expressed through counsel) to assert an insanity defense during trial; 3) the defendant's "lack of cooperation with mental health professionals and his subsequent denial of his mental illness to the trial court;" and 4) a doctor's report at sentencing indicating that the defendant had a mental illness that "may have been a factor in the [crime]." *Id.* at 313. "[M]ost importantly," we held, "by the sentencing hearing, the trial judge had changed her mind from when she had earlier rejected a requested *Frendak* inquiry and had serious concern that appellant had a mental illness when he committed the crime." *Id.* at 313. ("[T]he trial court itself expressed concerns about productivity based on bizarre pretrial behavior ... where appellant ... resisted every inquiry into a possible insanity defense") (quoting *Briggs*, 525 A.2d at 593). "Once the trial court entertained a serious question about appellant's mental condition at the time of the offense, and believed that appellant denied his illness, it had an independent obligation to conduct a *Frendak* inquiry." *Id.*

◼ In view of *Frendak, Briggs* and *Patton,* we conclude that, in this case, there were a number of factors that similarly call into question appellant's sanity at the time of the offense. There were clear indications of mental illness during the time preceding the offense, at the time of the offense and during the period after the offense.[14] There were a number of filings and comments made to the court by both defense and government counsel about a possible insanity defense,[15] and defense counsel expressly requested a bifurcated trial.[16] Evidence post-trial confirmed that

---

14. Appellant had a history of mental illness, including hospitalization in a mental health facility only six months before the offense; he exhibited bizarre behavior at the time of arrest, when the crime was committed, which prompted the government to request the initial competency screening; and he was diagnosed, post-arrest, as suffering from PCP-induced psychosis and a personality disorder that rendered him incompetent to stand trial for several months, until he was regularly medicated.

15. The government and defense counsel early in the proceedings indicated that both believed a not guilty by reason of insanity defense "may be the appropriate disposition in this case" and that appellant would like to proceed in that manner; defense counsel filed a motion giving notice of his intent to assert an insanity defense; defense counsel requested a productivity examination; and defense counsel stated that appellant wanted to proceed with an insanity defense, followed by later indications that counsel and client had disagreed about how to proceed regarding the insanity defense.

16. In this jurisdiction, a bifurcated proceeding is conducted when a defendant raises an insanity defense; accordingly, "the trier of fact does not consider the issue of insanity until the government has established the essential elements of the offense beyond a reasonable doubt. Only then, in the second phase, may the trier of fact reach the question of insanity." *See, e.g., Frendak,* 408 A.2d at 369 n. 4; *Kleinbart v. United States,* 426 A.2d 343, 355 (D.C.1981).

appellant's mental problems were long-standing: the pre-sentencing evaluation concluded that appellant suffered from a psychotic disorder induced by substance abuse, which significantly worsened when appellant was not on medication, and recommended that appellant should receive "intensive" mental health and substance abuse treatment. The trial judge himself commented during sentencing that it "may agree" that appellant "has mental illness" and sentenced him to a facility with mental health facilities "because of the mental health issues in this case." [17] Finally, from numerous medical reports and counsel, the trial court had been informed that appellant's mental stability and ability to control himself depended on whether he was on medication and that his psychotic symptoms worsened when appellant used controlled substances.[18] This information, coupled with appellant's admission that he had used marijuana and drunk alcohol on the day of the offense, suggested a high likelihood that appellant was, in fact, suffering from psychosis when people at the scene described him as "acting crazy." The one countervailing factor against all this evidence of mental illness is the one conclusory criminal responsibility examination/productivity report, which found that appellant could be held criminally responsible for the offenses.

The government seizes on this report as enough to relieve the trial court of an obligation to conduct a further inquiry under *Frendak*, relying on *Robinson v. United States,* 565 A.2d 964, 967–68 (D.C. 1989),[19] where we held that "in light of an unchallenged expert's report finding no productivity," and "[a]fter considering all the evidence before the trial judge at the time of trial, we cannot conclude the record raised a substantial question of the defendant's sanity at the time of the crime." Although some parallels can be drawn between the instant case and *Robinson,* we believe that this case differs from *Robinson* in a key respect: appellant's vigorous objections to the conclusory productivity examination that found him criminally responsible for the fire. Indeed, this productivity report appears to be inconclusive evidence of appellant's sanity at the time he committed the offense, particularly in light of the numerous red flags otherwise suggesting mental illness or defect. The report does not indicate how much time the psychiatrist spent with appellant; what documents or records (including appellant's medical history, for example) were reviewed or considered, if any; or what was the basis for the conclusion that appellant was criminally responsible. Moreover, the report is internally inconsistent, concluding that appellant was *not* suffering "from a mental disease or defect" yet reaching the diagnosis, in the very next sentence, that appellant suffered from "PCP-induced psychosis." If appellant suffered from *psychosis,* however in-

---

17. Notwithstanding this observation, the trial judge denied defense counsel's request at sentencing for an independent psychiatric expert to evaluate appellant.

18. Medical reports described appellant's unwillingness, when not taking medication, to engage in clinical therapy, to follow his medication regime, to bathe, or to speak to medical staff. Defense counsel commented that appellant was "a different person" when he was on medication and under medical supervision.

19. In *Robinson,* the defendant had been released from the Marines with a mental disability and had twice been found incompetent to stand trial, before he was found competent; expert opinion indicated the defendant was suffering from a long-term paranoid disorder; and the defendant had exhibited disruptive behavior at the District of Columbia Jail and in the hospital.

duced, on the day of the crime, he could have at least a *prima facie* case of not guilty by reason of insanity. *Compare Cooper v. United States,* 368 A.2d 554, 560 (D.C.1977) (finding sufficient evidence to go to the jury on appellant's insanity defense where expert testimony established that defendant was suffering from alcoholism and an alcohol-induced blackout that may have interfered with his ability to appreciate the wrongfulness of his acts, and noting that "though drug [ ] addiction standing alone does not permit a finding of nonresponsibility for a crime, it may do so in combination with other substantial evidence to this effect"), *with Barrett v. United States,* 377 A.2d 62, 63 (1977) (finding that voluntary intoxication through drugs or alcohol is not a defense to arson).

We are not persuaded that this one productivity report, which was not well-supported or documented, which was actively challenged by defense counsel, and which resulted from a productivity examination taking place over a year after the offense was committed, should have controlled the trial court's assessment of appellant's sanity at the time of the offense, particularly in the face of so many other potential indications of mental illness. There was ample evidence to the contrary in the reports of appellant's mental state and behavior near and during the time of the crime: as in *Patton,* appellant was, by many accounts, acting bizarrely at the time of his arrest on the day of the fire, which spurred the government to immediately request a competency evaluation. As in *Briggs,* he at first refused to cooperate with psychiatric evaluators, and was initially found incompetent to stand trial. He was not deemed competent until he was regularly medicated with anti-psychotic drugs and under psychiatric medical care at St. Elizabeths Hospital. The fact that it was this sustained medication and medical care that rendered him competent, and that the trial court was repeatedly informed that the only way to assure his continued competency was to ensure that he continued taking the drugs under supervision at St. Elizabeths, should have suggested to the trial judge that if appellant was not medicated and under medical supervision at the time of the fire, he therefore could well have been suffering a psychotic episode. *See Holmes v. United States,* 615 A.2d 555, 561 (D.C.1992) (noting that competency reports remarking that the appellant's condition had improved considerably due to medication and warning that appellant would only remain competent to stand trial if he continued taking his medication "support[ed] the theory that appellant may have suffered from a mental illness causing the assault and only gradually recovered after receiving necessary medication"). Here, the trial court was fully aware of all of these factors, as well as the many others listed above, in fact, appellant's mental capacity was discussed in nearly every hearing held in these proceedings. And, as in *Patton* and *Briggs,* the trial court voiced its own concerns during sentencing that appellant might be suffering from a mental illness. This question in the trial court's own mind, supported by evidence of appellant's mental instability and references to an insanity defense throughout the course of the proceedings, should have alerted the trial judge to the need to conduct a *Frendak* inquiry. On this record, the brief, unexplained, and potentially facially inconsistent conclusion laid out in the productivity report was insufficient to quell the apparent concerns regarding appellant's sanity expressed by appellant, his counsel, the government, and the trial court itself, from the beginning—and continuing throughout—the proceeding.

It bears noting that our decision—and the trial court's task—would

have been easier had defense counsel introduced contradictory expert testimony bearing on appellant's mental capacity at the time of the offense. But in *Briggs* we remanded for a *Frendak* inquiry in the absence of expert testimony that defendant was insane at the time of the offense, where there were other manifestations of serious mental illness before the judge. *See Briggs*, 525 A.2d at 592, 594. This is an area, moreover, where the trial court's responsibility is not wholly dependent on counsel's advocacy because the purpose of the *Frendak* inquiry is to safeguard the right of criminal defendants "to make decisions central to their defense, since they must bear the consequences of these decisions." *Frendak*, 408 A.2d at 375 (citing *North Carolina v. Alford*, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970) and *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975)). Thus, the court must "assure that the defendant has been fully informed of the alternatives available, comprehends the consequences of failing to assert the [insanity] defense, and freely chooses to raise or waive the defense." *Id.* at 380. Because this is a decision to be made by the defendant, the trial judge must be satisfied that the defendant has not been dissuaded from asserting (or waiving) the defense by counsel, the court, or any other person, when it is a viable option with potential benefits. Therefore, we particularly alert trial judges to the importance of conducting the inquiry when there is indication, as perhaps there was here, that the defendant and counsel may not agree on whether to present the defense, or at least where there is the suggestion that the defendant (or counsel) is equivocating. In such situations, it can be difficult to ascertain, without inquiry, whether there is merely a disagreement after the defendant has been fully advised, whether defendant is ill-informed, or whether counsel is conflicted between loyalty to her client's objective and counsel's own, contrary advice. In such a case, "the judge may choose to appoint *amicus* counsel to present evidence concerning the defendant's mental capacity." *Id.*

In sum, on this record we cannot be confident that appellant, although competent to stand trial, was fully informed of the possibility and consequences of raising the insanity defense, and that he freely chose to waive it. The specific circumstances of this case should have alerted the trial court that appellant's history of mental difficulties raised at least the possibility of presenting an insanity defense, and the trial court abused its discretion in not conducting a *Frendak* inquiry to assure itself that appellant's rights were adequately protected.

 We therefore remand the case so that the trial judge can conduct such a hearing. We realize that the passage of time, six years after the offense, makes even more challenging a task that can be difficult enough during trial proceedings already temporally removed from the crime—another reason for timely inquiry into the issue of a possible insanity defense. We therefore provide the following parameters for the trial court's proceedings on remand. The trial judge should first ascertain whether appellant was advised about and voluntarily waived a possible insanity defense—or, assuming that appellant is currently competent, is now willing to waive the defense after being properly advised.[20] If the trial court is

---

**20.** In *Frendak* we noted that

The scope of the inquiry for this determination will vary according to the circumstances present in each case, especially in relation to the background and condition of the defendant. It is important to note,

persuaded that appellant has knowingly and voluntarily waived the defense, that ends the matter. *Cf. Frendak,* 408 A.2d at 380 (noting that the trial court has discretion to interpose an insanity defense over a defendant's objection only if the court is convinced, after proper inquiry, that defendant cannot make a voluntary and intelligent decision on the matter). If, however, the trial court determines that appellant did not voluntarily and intelligently waive the defense at trial, and is either not willing or incompetent to do so at this time, the trial judge should decide whether appellant could have presented a prima facie case of insanity.[21] If so, the trial judge has discretion to raise the defense *sua sponte. See id.* at 380. If the trial judge so decides, appellant's convictions should be vacated and he should be granted a new trial to present an NGI defense. If, however, the trial court determines that the evidence does not make out a prima facie case of insanity, appellant's convictions stand, as he will have suffered no prejudice resulting from the trial court's failure to conduct a *Frendak* inquiry. Appellant should have counsel and should be afforded the necessary assistance, such as funds for payment to obtain expert testimony and competency and productivity examinations, necessary for appellant's presentation of evidence of a prima facie case of insanity and the trial court's consideration and determination of the issues we have outlined, as "necessary for an adequate defense." D.C.Code 11–2605(a) (2001); *see Gaither v. United States,* 391 A.2d

1364, 1368 (D.C.1978) (noting that in determining what is "necessary to an adequate defense" the trial court should rely on "the judgment of defense counsel who has the primary duty of providing an adequate defense").

## III.

We turn to review—and reject—appellant's other claims.

### A. *The Arson Jury Instruction*

■■■■ Appellant argues that the trial court erred in refusing to use the word "maliciously" in instructing the jury on arson to denote the requisite *mens rea,* as defined in the statute. *See* D.C.Code § 22–401 (1996), *supra* note 2.

In its final instructions to the jury on the elements of arson, the trial court instructed the jury:

> The essential elements of the offense of arson, each of which the government must prove beyond a reasonable doubt[,] are one, that the defendant burned or attempted to burn a building.
>
> Two, that the building was the property in whole or in part of someone other than the defendant; and three, that the defendant set fire to the building voluntarily and on purpose, not by mistake or accident; and fourth, that the defendant acted with the intent to kill or injure another person with the intent to threaten the security of anyone who lived in or occupied that building or other property

however, that because the court is dealing with an individual whose sanity has been questioned, a cursory explanation or a rote interrogation cannot satisfy the court's duty.

408 A.2d at 380 (internal citations omitted).

21. "[I]n the District of Columbia, the defendant has the burden of proving insanity by a preponderance of the evidence." *Patton,* 782 A.2d at 311; D.C.Code § 24–301(j) (2001).

To establish a prima facie case, the defendant must present sufficient evidence to show that "at the time of the criminal conduct, as a result of a mental illness or defect, he lacked substantial capacity to recognize the wrongfulness of his act or to conform his conduct to the requirements of the law." *Patton,* 782 A.2d at 312 (quoting *Pegues v. United States,* 415 A.2d 1374, 1378 (D.C.1980)).

or in conscious disregard of a known and substantial risk that his action would endanger life or threaten the security of anyone who lived in, who occupied that building or other property.

This instruction mirrors that found in the Redbook instruction 4.33. *See* Criminal Jury Instructions for the District of Columbia, No. 4.33 (4th ed.1993).

Even assuming that appellant has not waived his objection by failing to object at the time the instruction was given,[22] we perceive no error in the instruction given. In *Comber*, the case upon which the trial court relied, the *en banc* court suggested that the term "malice" "together with concepts associated with malice such as acting with a 'bad or evil purpose' or with a 'wicked heart,' " not be used in jury instructions because of its potential to confuse jurors. *Comber*, 584 A.2d at 42 n. 18; *Thomas v. United States*, 557 A.2d 1296, 1305 n. 17 (D.C.1989); *Charles v. United States*, 371 A.2d 404, 411 (D.C.1977). The trial court's instruction to the jury, moreover, comported with the definition of malice suggested in *Carter v. United States*, 531 A.2d 956, 962 (D.C.1987) (quoting *Charles v. United States*, 371 A.2d 404, 411 (D.C.1977)): "All that is required is a conscious disregard of a known and substantial risk of the harm which the statute is

intended to prevent." Therefore, there was no error in the trial court's omission of the word "maliciously" from the arson instruction.

### B. *Double–Jeopardy Claim*

■■■ Appellant claims that the correction of his sentence, which increased the maximum amount of time appellant could potentially serve, subjected him to double jeopardy. On March 20, 2002, pursuant to D.C.Code § 24–403.01 (2001), which provides for determinate sentencing, Judge Motley sentenced appellant to eight years imprisonment for arson, five years imprisonment for destroying property; and six years imprisonment for second-degree cruelty to children. The sentences for malicious destruction of property and cruelty to children were to run concurrently with each other and consecutively to the sentence of eight years for arson.[23] These sentences would incarcerate appellant for fourteen years. The determinate sentencing scheme under which this initial sentence was imposed is only applicable to crimes committed on or after August 5, 2000. *See* D.C.Code § 24–403.01 (2001). Consequently, two days later, Judge Motley, who had recognized his error in applying the determinate sentencing statute to appellant's offenses (committed on June

---

**22.** As the trial court was about to give its preliminary instructions to the jury, defense counsel objected to the use of the word "maliciously" in the jury instruction on arson, stating that "we would like the word malicious *out.*" Although the transcript is not entirely clear, defense counsel later seemed to indicate that she would like the word "maliciously" included in the instruction, and the trial court stated it would not read the elements of the offenses in the preliminary instructions, and that they could discuss the matter in more detail at a later point. The following day, before the jury arrived, defense counsel stated that she would like "to reserve the right to argue for the change I mentioned when you are reading the final instruction."

The court noted that it had read over *Comber v. United States*, 584 A.2d 26 (D.C.1990), which indicated that the "maliciously" language was archaic and should be updated. However, the trial court indicated that the matter remained open, and that the burden was on defense counsel to raise it later and convince the trial court otherwise. Defense counsel never again raised the issue.

**23.** The court also sentenced appellant to three years of supervised release on each count, these terms running concurrently, and assessed $300 in costs to be paid to the Victims of Violent Crime Compensation Fund.

27, 2000), recalled the parties to a hearing and allowed each to argue how the court should resentence appellant under the proper, indeterminate sentencing scheme applicable to crimes committed before August 5, 2000, see D.C.Code § 24–403 (2001),[24] in order "to effectuate what the [c]ourt's thinking was." The government argued for three consecutive three to nine year sentences; appellant argued that the sentences be made concurrent. The trial court then resentenced appellant, in accordance with D.C.Code § 24–403, and "to achieve the Court's purpose," to three to nine years' incarceration for each count, with those terms to run consecutively. Therefore, appellant's new sentence provided that he would be imprisoned at least nine years, and up to twenty-seven years.

 The Superior Court Rules of Criminal Procedural provide that the trial court "may correct an illegal sentence at any time." Super. Ct.Crim. R. 35. This court has held that a sentence may be corrected, "even if the defendant receives a stiffer sentence as a result." *Smith v. United States*, 687 A.2d 581, 583 (D.C. 1996) (citing *Gray v. United States*, 585 A.2d 164, 166 (D.C.1991)) (affirming trial court's correction of defendant's illegal five-to-fifteen month sentence to a proper five-to-fifteen year sentence) (citing *Bozza v. United States*, 330 U.S. 160, 166–67, 67 S.Ct. 645, 91 L.Ed. 818 (1947)). Sentences inconsistent with the controlling sentencing statute are illegal—"a nullity"—and do not constrain imposition of a legal sentence. *Kerns v. United States*, 551 A.2d 1336, 1337 (D.C.1989); *see Prince v. United States*, 432 A.2d 720, 720–22 (D.C.1981) (affirming where trial court modified an unlawful six-year sentence by imposing an indeterminate term not to exceed ten years as required by prevailing law, and noting "[i]t has long been established that a sentence is a nullity if it is illegal for being at variance with the controlling sentencing statute, and it may be corrected at any time under Rule 35, ... even if it increases the punishment). Because appellant's initial sentence was inconsistent with the controlling sentencing scheme, the trial court was authorized to correct its sentence to bring it in conformity with the law. We note that the corrected sentence does not necessarily prejudice appellant and may, in fact, prove to be shorter. It is possible that, in the end, appellant could serve less time under the corrected sentence, with the opportunity—depending on assessment of his parole eligibility—of being incarcerated nine years, less than the fourteen-year determinate sentence originally (and erroneously) imposed. That there is a *possibility* of a maximum of twenty-seven years is largely within the power of appellant to thwart.

## C. Merger

Appellant argues that the crime of malicious destruction of property is a lesser-

24. Under the applicable indeterminate sentencing scheme, the maximum sentence for each of the offenses was ten years. See notes 2–4, *supra*. With respect to the imposition of indeterminate sentences, D.C.Code § 24–403 provides:

(a) Except as provided in subsections (b) and (c) of this section [inapplicable to this case], in imposing sentence on a person convicted in the District of Columbia of a felony, the justice or judge of the court imposing such sentence shall sentence the person for a maximum period not exceeding the maximum fixed by law, and for a minimum period not exceeding one-third of the maximum sentence imposed, and any person so convicted and sentenced may be released on parole as herein provided at any time after having served the minimum sentence. Where the maximum sentence imposed is life imprisonment, a minimum sentence shall be imposed which shall not exceed 15 years imprisonment.

included offense of arson, and, therefore, his convictions for the two offenses should merge. Appellant is incorrect. This court held in *Logan v. United States,* 460 A.2d 34, 38 (D.C.1983), that the offenses of malicious destruction of property and arson do not merge because the former requires proof of damage exceeding $200, an element not required for the latter (thus satisfying the *Blockburger*[25] test); and the two crimes are meant to protect different interests: malicious destruction of property protects against injury or harm to property, whereas arson involves conduct endangering human life and offending the security of habitation or occupancy. *See also In re W.B.W.,* 397 A.2d 143, 147 (D.C. 1979). *Logan* controls here, and therefore appellant's merger claims fail.

### D. *Sufficiency of the Evidence*

 Appellant argues that there was insufficient evidence to convict him of any of the three charged offenses. In reviewing challenges to the sufficiency of the evidence, "we must view the evidence in the light most favorable to the government, mindful of the jury's right to determine credibility, weigh the evidence, and draw justifiable inferences of fact." *Paris v. United States,* 515 A.2d 199, 203 (D.C. 1986) (quoting *McClain v. United States,* 460 A.2d 562, 567 (D.C.1983) (citations omitted)). There is no legal distinction between direct and circumstantial evidence, *see Hall v. United States,* 454 A.2d 314, 317 (D.C.1982), and reversal is warranted "only where there is no evidence upon which a reasonable mind could infer guilt beyond a reasonable doubt." *Head v. United States,* 451 A.2d 615, 622 (D.C. 1982) (citations omitted); *see also Murchi-*

*son v. United States,* 486 A.2d 77, 81 (D.C. 1984).

Malicious destruction of property requires proof that appellant "maliciously injure[d] or br[oke] or destroy[ed], or attempt[ed] to injure or break or destroy, by fire or otherwise, any public or private property, whether real or personal, not his or her own, of the value of $ 200 or more...." D.C.Code § 22–403 (1996). To convict of arson, the government must prove that appellant "maliciously burn[ed] or attempt[ed] to burn any dwelling, or house...." D.C.Code § 22–401 (1996).

 As discussed above in connection with appellant's claim of instructional error, to establish that appellant acted "maliciously," the government is required to prove that he acted with a "conscious disregard of a known and substantial risk of the harm which the statute is intended to prevent." *Carter v. United States,* 531 A.2d 956, 962 (D.C.1987) (quoting *Charles v. United States,* 371 A.2d 404, 411 (D.C. 1977)). "[A]lthough malice may be inferred from intentional wrongdoing, the only intent required to be proven is the intent to do the act which results in the injury—in other words a general intent." *Gonzalez v. United States,* 859 A.2d 1065, 1067 (D.C.2004). Thus, the requisite intent for malicious destruction of property is an "intent to injure or destroy the property, for a bad or evil purpose, and not merely negligently or accidentally." *Id.* at 1068. With respect to arson, the government must prove that appellant acted intentionally, and not merely negligently or accidentally, while consciously disregarding the risk of "endangering human life

---

**25.** *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932), held that "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine

whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *See also Alfaro v. United States,* 859 A.2d 149, 155 (D.C.2004).

and offending the security of habitation or occupancy." *See Logan,* 460 A.2d at 38.

Applying these elements to the evidence at trial, we conclude that the evidence was sufficient—if appellant was not insane—to permit the jury to find that appellant intentionally set fire to his mother's apartment and its contents and that he did so with conscious disregard of the substantial risk to the property and to the building's occupants, including his six-year old niece. Appellant, who admitted to the police that he started the fire, was seen in the burning apartment, and, immediately thereafter, calmly walked away without alerting anyone to the danger. The jury could infer that appellant was motivated to do so because he had recently been arguing with his mother and made statements that he would burn it again, and next time he would "do it right." In addition, evidence was introduced establishing that the cost of the damage exceeded $25,000. This evidence, therefore, sufficed to convict appellant of arson and malicious destruction of property.

 This evidence also suffices to sustain a conviction for second degree cruelty to children, which is committed by "intentionally, knowingly, or recklessly . . . engag[ing] in conduct which causes a grave risk of bodily injury to a child." D.C.Code § 22–1101(b)(1) (2001). Starting a fire in the apartment—an apartment in which, appellant knew, his six-year old niece was present—constitutes at least reckless behavior creating a grave risk of bodily injury to the child.[26]

## IV.

We, therefore, remand for a *Frendak* inquiry to determine whether appellant knowingly and intelligently waived the insanity defense, see discussion *supra* at—, but reject appellant's other claims on appeal.

*So ordered.*

GLICKMAN, Associate Judge, with whom SCHWELB, Senior Judge, joins, concurring:

I have serious misgivings about several aspects of this court's decision in *Frendak v. United States,* 408 A.2d 364 (D.C.1979), particularly (though not exclusively) its unconsidered assumption that it is for *the trial judge* to decide whether an insanity defense should be presented on behalf of a defendant who lacks the capacity to waive the defense. The source of this assumption was *Whalem v. United States,* 120 U.S.App. D.C. 331, 346 F.2d 812 (1965) (en banc), *overruled by United States v. Marble,* 291 U.S.App. D.C. 279, 940 F.2d 1543 (1991), which had held that a trial judge has discretion to impose an unwanted insanity defense even on a competent defendant. Although we recognized in 1979 that the "philosophical basis" of *Whalem* had been "substantially undermined by subse-

---

**26.** Appellant's contention that the trial court refused to allow defense counsel to ask any questions regarding appellant's state of mind at the time of the offense is not supported by the record. Appellant does not cite, nor could we find, any indication in the record that the trial court prohibited this line of questioning. In fact, after defense counsel asked Mr. Spinner questions about appellant's "bizarre behavior" on the day of the incident, the trial court denied a government motion to prevent defense counsel "from cross examining witnesses with leading questions which suggest that the defendant was suffering under any mental defect that day." The trial court ruled only that appellant could not attempt, at that point, to introduce an insanity defense, but noted that defense counsel's questions to the witnesses had not yet "come close to the line." The record does not reflect any other attempts by defense counsel to question witnesses regarding appellant's state of mind or behavior on the day of the offense.

quent Supreme Court decisions," *Frendak,* 408 A.2d at 379 n. 27, and accordingly held that the trial judge "will now have the discretion to raise an insanity defense *sua sponte* only if the defendant is not capable of making, and has not made, an intelligent and voluntary decision," *id.* at 379, we nonetheless accepted the premise that, at least for such incapacitated defendants, the choice of whether to present an insanity defense is a proper exercise of judicial authority.

That premise should not go unexamined. Merely because a criminal defendant may lack the capacity to waive an insanity defense does not mean that it is necessarily the judge who should decide whether that defense should be pursued. A judge's loyalties are not to the defendant, and the judge may be motivated by considerations other than the defendant's best interests. There are alternatives to assigning the decision to the judge which *Frendak* did not consider, such as appointing a guardian to investigate and make the choice for the defendant in a confidential and unconflicted manner.

Having flagged the issue, I acknowledge that no question has yet been raised in the present case about this or other dubious (at least to me) aspects of *Frendak.* I therefore join the majority opinion, leaving the task of reconsidering *Frendak* for another occasion.