**Derrick A. PATTON, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 98–CF–1859.**

District of Columbia Court of Appeals.

Argued Jan. 17, 2001.

Decided Oct. 4, 2001.

---

William T. Morrison, appointed by the court, for appellant.

Kenneth W. Cowgill, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney at the time the brief was filed, and John R. Fisher and Matthew G. Olsen, Assistant United States Attorneys, were on the brief for appellee.

Before STEADMAN, RUIZ and WASHINGTON, Associate Judges.

RUIZ, Associate Judge:

After a jury trial, Derrick Patton was convicted of aggravated assault (D.C.Code § 22–504.1) and mayhem (§ 22–506), both while armed (§ 22–3202), possession of a firearm during a crime of violence (§ 22–3204(b)), carrying a pistol without a license (§ 22–3204(a)), possession of an unregistered firearm (§ 6–2311(a)), unlawful possession of ammunition (§ 6–2361(3)), and escape (§ 22–2601(a)(2)). Patton argues on appeal that the trial court abused its discretion in not conducting a *Frendak*[1] inquiry to determine whether he voluntarily and intelligently waived an insanity defense. We agree, and remand the case for a *Frendak* inquiry.

---

1. *Frendak v. United States*, 408 A.2d 364, 380 (D.C.1979) (holding that when evidence raises a substantial question about the defendant's sanity at the time of the crime, the trial judge must conduct an inquiry to assure that the defendant intelligently and freely chooses to raise or waive the insanity defense).

## FACTUAL SUMMARY

### 1. Factual Background

On January 11, 1998, Patton, Juanita Gregory (his mother), and Ms. Gregory's granddaughter, Akia West, were in Ms. Gregory's home, when Ms. Gregory and Akia noticed appellant acting "jumpy" and handling a gun and a knife. At some point, Patton told Akia to "stab him in the neck." When Ms. Gregory and Patton were alone in a room, appellant, without warning, stabbed his mother with a knife. Akia heard her grandmother scream, rushed into the room and found that she had been stabbed in the back of the neck.

Appellant visited his mother at the Washington Hospital Center, where Ms. Gregory was taken following the attack, and after being identified as the perpetrator, he was arrested. Detective John Paprcka interviewed appellant and stated that "he was acting kind of strange in that manner where we would ask him something and he would go off on a different subject." The detective testified that "there was no odor of alcohol and there was no odor of marijuana," but "[appellant] stated he had smoked weed with crack and PCP the night before." The detective was concerned that either appellant had been intoxicated, or there was something mentally wrong with him.

### 2. Proceedings Bearing on Insanity Defense

### A. Pretrial Proceedings

On January 15, 1998, four days after he attacked his mother, appellant's case was called for a preliminary hearing. During the hearing, appellant was acting fidgety, pushing his chair away from the table, and repeatedly looking at the double doors of the courtroom. At one time, while a witness was testifying, he stood up when the judge was talking with the witness. Appellant's strange behavior culminated at the conclusion of the hearing, when he attempted to run from the courtroom and law enforcement officers apprehended him before he could escape.

On April 8, 1998, counsel for appellant filed a motion for a competency examination, noting that appellant: 1) stabbed his mother for no known reason, 2) disrupted the preliminary proceedings, 3) was reported by the District of Columbia Jail as exhibiting paranoid behavior and hearing voices, and 4) made bizarre comments, and was refusing to cooperate with mental health staff. The motion was granted and on April 10, 1998, Dr. Lawrence S. Oliver, Ph. D. of the Commission on Mental Health Services conducted a ten-minute interview with appellant. Appellant, however, refused to cooperate and Dr. Oliver was unable to form an opinion concerning appellant's competency to stand trial.[2]

■ When the matter was next called, on April 13, counsel asked for a 45–day evaluation at Saint Elizabeths Hospital to determine whether appellant was competent to stand trial and competent to waive the insanity defense. Counsel rejected the judge's invitation to also subject appellant to a productivity examination at the same time.[3] On June 3, 1998, Dr. Oliver con-

---

2. Dr. Oliver stated that appellant told him he was " 'wasting [his] time' and [r]eclined in a prone position on the bench of the cell and refused to respond further." Dr. Oliver noted, "[i]t was not possible to determine if [appellant's] behavior was the result of volitional

characterological traits, mental illness, substance abuse, or some combination of these factors."

3. A productivity examination is a psychiatric examination which inquires into the defen-

ducted a seventy-minute interview of appellant at a mental health unit of the District of Columbia Detention Facility. Dr. Oliver submitted a report on June 4, 1998,[4] in which he found that appellant exhibited "severe antisocial characterological traits that included a sense of entitlement, defiant disregard for societal norms, manipulativeness and ... a lack of empathy for others." He opined, however, that appellant had no mental illness. Dr. Oliver concluded that as there were no mental problems that would substantially impair appellant's capacity to have a factual and rational understanding of the proceedings or to assist his counsel, he was competent to stand trial.

Dr. Oliver also noted that appellant was competent to enter or reject a plea. Dr. Oliver further observed that appellant had no interest in pleading insanity because he did not believe he was insane and because of the indefinite confinement that could result. The trial court adopted Dr. Oliver's report and finding of competency without objection.

B. Proceedings at Trial

Appellant's second incident of disruptive behavior in the courtroom occurred on July 17, the first day of trial, when he attempted to speak out in open court. Appellant stated that he wanted the jury to know that "[he was] not getting legally represented." During a colloquy with appellant at the bench, the trial court told appellant that his own behavior was hurting his case, and to "try and be respectful

when this jury is sitting." After dismissing the jury for about twenty minutes, the trial court continued the colloquy with appellant, remarking that appellant was hurting his own case by acting up and refusing to wear civilian clothing. The court also denied appellant's oral motion for new counsel.

The trial resumed after the weekend, on July 20. After a conversation between the trial court and defense counsel on whether a defense of diminished capacity or intoxication was legally viable, appellant's counsel abruptly moved to withdraw on grounds of ineffectiveness. Counsel stated, "I was not effective. I did not explain to [appellant] the not guilty by reason of insanity defense properly and he wishes to raise that." She noted that amicus counsel had never been appointed to represent appellant and the following colloquy took place:

Ms. Rodriguez: Well, Your Honor, we also have the [Frendak] whether he was even competent to waive the insanity defense and there was never a lawyer.

The Court: But you have to have an insanity defense available to waive it. Who says he was insane, anybody?

Ms. Rodriguez: At this point—

The Court: In other words, I don't even need an amicus, but a perfectly sane person who has no insanity defense because he's not insane but not productive, right? This was not a product of insanity ... First you got to establish that he has a legitimate insanity defense. And

dant's sanity at the time he committed the offense, whereas a competency examination looks to whether the defendant is competent to stand trial, understand the proceedings against him, and effectively consult with counsel concerning the proceedings against him. *See generally Frendak*, 408 A.2d at 367; *Briggs v. United States*, 525 A.2d 583, 591 (D.C.1987).

4. Dr. Oliver based his report on his interview with appellant, the MPD Statement of Facts, the Complaint, the grand jury indictment, the drug screening test results, the Pretrial Services Agency report, the Bureau of Legal Services clinical record, and the Commission on Mental Health (CMHS) Services patient information printout.

then if you failed to inform him of his ability or his right to assert it ... you probably got an issue there ...

The parties then discussed Dr. Oliver's competency report:

The Court: [The report] says that Mr. Patton was alert, fully oriented ... At no time did Mr. Patton present or behave in a manner typical of people who are mentally ill or intoxicated with illicit drugs or alcohol ... my version of the law is doesn't he have to have a legitimate insanity defense in order to waive it? Even a semblance of an insanity defense. He doesn't have one, he never did from this report, and I don't hear you telling me there's any other psychiatrist anywhere in the world who disagrees with Oliver.

After a recess, the proceedings resumed without further discussion of removal of counsel or a defense of insanity.

C. Sentencing Proceedings

During sentencing, new information was presented regarding defendant's mental state. Trial counsel had addressed a letter to the court the day before sentencing, enclosing the report of a psychologist, Sarah Jane Elpern.[5] The purpose of the report was to provide information "concerning [appellant's] cognitive and personality functioning in order to better understand his behavior and to help develop a plan of interventions for sentencing." The report suggested that mental illness may have been a factor in the stabbing stating,

"[b]asically Mr. Patton is in tremendous denial that he might have a mental illness and that the stabbing of his mother may indeed be a product of a delusional system ... Unfortunately, the nature of his psychiatric problems are such that he will remain a risk, especially to his mother, if he does not take medication and get treatment."[6] The report also hinted at potential reasons for the previous failures in diagnosing appellant, stating, "[d]iagnostically, Mr. Patton presents a great deal of difficulty because of his unwillingness to admit mental illness and because of his unwillingness to give more than only very fleeting glimpses into his inner thoughts and behavior."

During the sentencing hearing on December 10, 1998, the trial judge, with commendable candor, indicated that she had changed her mind regarding appellant's sanity and believed appellant had serious mental health problems. In a colloquy with the prosecutor as to why appellant would have stabbed his own mother, the trial court stated, "[n]o, it isn't [hard to understand] ... If he were perfectly rational. But isn't it clear that he has got to have a mental health problem? You read the presentence report. Something is very, very wrong with him, right?" The court then went on to speak with appellant regarding his mental illness:

Appellant: But what I'm trying to say is I have more control.

The Court: ... But if you are mentally ill, then you probably need to find out

---

5. Dr. Elpern interviewed appellant on three occasions and administered about twenty different psychological tests. She also spoke to his mother twice, and reviewed numerous documents connected to the case, including the psychological evaluations performed by Dr. Oliver.

6. In contradiction to her previous plea to put on an insanity defense, trial counsel's letter made clear that she disagreed with the report and did not find appellant to be insane. She stated, "[a]lthough Dr. Elpern and Joe [Cohen, a social worker] believe Derrick [Patton] suffers from mental illness, Derrick suffers from the cruel vengeance of the streets which devoured him when he was young and trustful." She also stated, "Derrick is not crazy, and he does not deserve to be treated like a mad monster terrorizing sane humans."

about it. Because it's not the kind of thing that says every day you're crazy. But it does mean that there is something about you that needs some treatment—I don't know if it's medication treatment or some other kind of treatment, but *nobody goes this far off the mark, nobody does, especially one time.*

. . .

The Court: Well, I think my hands are tied . . . I don't have the ability to correct mental illness against a person's will . . . It is perfectly okay to not believe that you are mentally ill. There is hardly a mentally ill person out there who believes it. That's the difficulty with mental illness, it doesn't tell you that you are ill . . . So what I have is a guy who, for reasons I just can't explain—either you are severely mentally ill or there is something else very wrong with this picture—who, on an occasion, did an absolutely outrageous thing that was severely violent.

The trial court then sentenced appellant to consecutive terms of fifteen years to life and ten to thirty years on the first two counts, and on the third through sixth counts, respectively, to five to fifteen years, twenty to sixty months, one year, and one year, concurrently to each other and the others. On the last count he was sentenced to twenty to sixty months, consecutive to the others.

## ANALYSIS

Appellant contends that the court was obligated to reconsider its previous deci-

sion not to conduct a *Frendak* inquiry, after receiving the presentencing psychiatric evaluation of Dr. Elpern which indicated that appellant had a serious mental condition and raised questions as to his sanity at the time of the crime. He argues that once the trial court opined during sentencing that he had a serious mental condition it should have *sua sponte* conducted a *Frendak* inquiry. The government argues that the Elpern report was vague and raised no substantial question as to appellant's insanity at the time of the offense. It also contends that appellant faces procedural difficulties in raising this issue on direct appeal because the "various pieces of information which were before the trial court [during trial] . . . revealed with near unanimity that the defendant did not have a defense of insanity available to him." While we perceive no error in the manner in which the trial court evaluated the issue of an insanity defense during trial,[7] we hold that once the court was faced with a substantial question during sentencing as to appellant's mental capacity at the time of the crime, it should have conducted a full *Frendak* inquiry. Thus, we remand for a *Frendak* inquiry and hearing to determine whether appellant voluntarily and intelligently waived an insanity defense.

■ As an initial matter, in the District of Columbia, the defendant has the burden of proving insanity by a preponderance of the evidence. D.C.Code § 24–301(j).[8] To

---

7. The trial court stated, "[The report] says that Mr. Patton was alert, fully oriented . . . At no time did Mr. Patton present or behave in a manner typical of people who are mentally ill or intoxicated with illicit drugs or alcohol . . . My version of the law is doesn't he have to have a legitimate insanity defense in order to waive it?"

8. Insanity shall not be a defense in any criminal proceeding in the United States District Court for the District of Columbia or in the Superior Court of the District of Columbia, unless the accused or his attorney in such proceeding, at the time the accused enters his plea of not guilty, or within 15 days thereafter, or at such later time as the court may for good cause permit, files with the court and serves upon the prosecuting at-

establish a *prima facie* case, the defendant must present sufficient evidence to show that "at the time of the criminal conduct, as a result of a mental illness or defect, he lacked substantial capacity to recognize the wrongfulness of his act or to conform his conduct to the requirements of the law." *Pegues v. United States,* 415 A.2d 1374, 1378 (D.C.1980).

In *Frendak* we were confronted with the question of whether a defendant had voluntarily and intelligently waived an insanity defense. *See Frendak,* 408 A.2d at 367. In that case, slightly different from the present case, the trial court had *sua sponte* conducted an inquiry into the defendant's sanity at the time of the crime and interposed over defendant's objection an insanity defense, without conducting an inquiry into whether the defendant had voluntarily and intelligently waived the defense. *See id.* at 369. We held that a trial court has discretion to interpose an insanity defense over a defendant's objection only if the court is convinced, after proper inquiry, that the defendant has not made, and cannot make, such a voluntary and intelligent decision. The rule that stemmed from *Frendak* is that when the evidence suggests a substantial question about the defendant's mental condition at the time of the crime, the trial court must make three separate determinations, in the following order: 1) whether the defendant is competent to stand trial; 2) if so, whether he or she, based on present mental capacity, can intelligently and voluntarily waive the insanity defense[9] and has done so; 3) if not, whether the court should *sua sponte* impose the insanity defense based on evidence of the defendant's mental condition at the time of the alleged crime. *See Anderson v. Sorrell,* 481 A.2d 766, 769 (D.C.1984). In this case, the trial court adopted Dr. Oliver's finding that appellant was competent to stand trial. As to the second determination, which is particularly relevant to the instant case, *Frendak* requires that,

> "[W]henever the evidence suggests a substantial question of the defendant's sanity at the time of the crime, the trial judge must conduct an inquiry designed to assure that the defendant has been fully informed of the alternatives available, comprehends the consequences of failing to assert the defense, and freely chooses to raise or waive the defense."

*Frendak,* 408 A.2d at 380. "The scope of the inquiry ... will vary according to the circumstances present in each case ..." *Id.*[10] The trial judge's decision whether to conduct a *Frendak* inquiry is reviewed for abuse of discretion. *See generally Frendak,* 408 A.2d at 379; *Briggs,* 525 A.2d at 593 (D.C.1987).

In *Briggs,* we concluded that a *Frendak* inquiry was required when the trial court

---

torney written notice of his intention to rely on such defense. No person accused of an offense shall be acquitted on the ground that he was insane at the time of its commission unless his insanity, regardless of who raises the issue, is affirmatively established by a preponderance of the evidence. D.C.Code § 24–301(j).

9. In *Godinez v. Moran,* 509 U.S. 389, 391, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993), the Court held that the competency standard is the same for pleading guilty and waiving the right to counsel. It did not decide, nor do we here, whether the standard for evaluating competence to waive the insanity defense also is the same.

10. *See generally United States v. Robertson,* 165 U.S.App.D.C. 325, 338, 507 F.2d 1148, 1161 (1974)) (providing a guide as to the procedure the trial court could employ); *Briggs,* 597 A.2d at 374 (discussing role of amicus counsel, free from the obligation to follow the instructions of a client, in making a factual and legal presentation to assist the court).

faced the following evidence: 1) a flood of bizarre letters from appellant to the court, including requests for self-representation; 2) psychiatric evaluations diagnosing appellant as paranoid schizophrenic and questioning his competency; and 3) appellant's refusal to cooperate with court-ordered examinations into productivity coupled with his desire to waive an insanity defense and his attorney-advisor's representation that an insanity defense was possible but unlikely. *See Briggs*, 525 A.2d at 592. Similar to the instant case, the defendant in *Briggs* would not fully cooperate with the doctors and his attorney was ambivalent about utilizing an insanity defense. *See id.* at 592. We held that, "the trial court [should not] ... permit the defendant to accomplish waiver ... through inaction or obstreperous behavior that blocks the court's inquiry." *Id. Cf. Wilson v. United States*, 403 A.2d 333, 335–7 (D.C.1979) (trial court did not err in declining to hold hearing on whether to impose insanity defense when, *inter alia,* court had received two medical reports concluding defendant was not suffering from mental disease at the time of the offense); *Clyburn v. United States*, 381 A.2d 260, 262–263 (D.C.1977) (trial court did not abuse discretion in declining to raise question of defendant's competence to stand trial and sanity at time of offense when factors cited by defendant at most demonstrated a troubled man); *Robinson v. United States*, 565 A.2d 964, 967 (D.C. 1989) (noting that in light of unchallenged expert's report finding no productivity, the insanity argument is too speculative).

We believe that, as in *Briggs*, here there were several factors indicating that a *Frendak* inquiry might be needed: (1) appellant's bizarre behavior soon after the attack as observed by the investigating detectives and the officers at District of Columbia Jail, and as exhibited in court at the preliminary hearing and on the first day of trial; (2) appellant's desire (expressed through counsel) to assert an insanity defense during trial; (3) appellant's lack of cooperation with mental health professionals and his subsequent denial of his mental illness to the trial court; and (4) Dr. Elpern's report at sentencing indicating that appellant had a mental illness. But most importantly, the record is clear that, by the sentencing hearing, the trial judge had changed her mind from when she had earlier rejected a requested *Frendak* inquiry and had serious concern that appellant had a mental illness when he committed the crime. *See Briggs*, 525 A.2d at 593, quoting *Frendak*, 408 A.2d at 380 ("the trial court itself expressed concerns about productivity based on bizarre pretrial behavior ... where appellant has resisted every inquiry into a possible insanity defense"). While at trial the judge had stated that appellant did not have "even a semblance of an insanity defense," during sentencing she stated, "nobody goes this far off the mark, nobody does, especially one time ... either you are severely mentally ill or there is something else very wrong with this picture." In addition, like in *Briggs*, the colloquy between appellant and the trial judge during sentencing indicated that the trial judge believed appellant was trying to deny his illness. The court stated, "it is perfectly okay to not believe that you are mentally ill. There is hardly a mentally ill person out there who believes it." Once the trial court entertained a serious question about appellant's mental condition at the time of the offense, and believed that appellant denied his illness, it had an independent obligation to conduct a *Frendak* inquiry. *See Briggs*, 525 A.2d at 592 ("the trial court must be particularly sensitive to evidence of insanity at the time of the crime which the defendant may be trying to withhold."); *Cf. Clyburn v. United States,*

381 A.2d at 263. ("Where, as here, no motion for commitment is made, the trial court is nevertheless obligated to make or compel inquiry if it is in receipt of information which raises a bona fide doubt of defendant's competence.").

■ *Frendak* establishes the trial court's responsibility when there is a "substantial question" of an insanity defense. *See Frendak,* 408 A.2d at 380. "[B]ecause the court is dealing with an individual whose sanity has been questioned, a cursory explanation or a rote interrogation cannot satisfy the court's duty." *Id.; Briggs,* 525 A.2d at 592. While there were many hints of appellant's possible mental illness before sentencing, the trial court did not abuse its discretion in failing to conduct the inquiry during trial, as there was conflicting information regarding appellant's mental condition. Once the court received Dr. Elpern's report and the court itself expressly questioned appellant's mental state during sentencing, however, it was obligated to inquire further. *Frendak* states that even when a defendant has

decided to forego an insanity defense, the trial judge "will still have the duty to confront the insanity issue if the evidence adduced *in the proceedings* raises a 'sufficient question as to a defendant's mental responsibility at the time of the crime.'" 408 A.2d at 379 (quoting *Whalem v. United States,* 120 U.S.App.D.C. 331, 337, 346 F.2d 812, 818 (1965)) (emphasis added). Dr. Elpern's report and the colloquy between the appellant and the trial court at sentencing, while after trial, was still raised during the proceedings, and a substantial question arose in the trial judge's mind regarding appellant's mental capacity. This, in combination with the evidence both during and before trial, was enough to trigger the trial court's obligation.[11] Accordingly, we remand for a *Frendak* inquiry.[12]

---

11. We note that the trial court has discretion to order psychiatric evaluations to resolve appellant's capacity for waiver. If the court concludes that appellant made a voluntary and intelligent decision at the time of trial to waive an insanity defense, that will end the matter and the conviction will stand. *See Frendak,* 408 A.2d at 380. If the court concludes that appellant did not make such a waiver, then the court is to determine whether appellant wishes to waive the insanity defense. If he does not, or if he is presently incapable of making a voluntary and intelligent decision, the court should order a productivity examination to determine whether there is sufficient evidence for an insanity defense. If the court orders a productivity examination, appellant cooperates, and the court concludes as a result that appellant's actions at the time of the crime may have been the product of insanity, the court has discretion to order a new insanity phase of the trial. *See Briggs,* 525 A.2d at 594.

12. The government contends that because the substantial question as to insanity did not become clear until sentencing, a better avenue would have been a motion for a new trial under Rule 33 or for relief under D.C.Code § 23–110. *See Clyburn,* 381 A.2d at 262 n. 4 (noting that where possible, the better road to review is by a motion for a new trial under Rule 33). This would have had the benefit of bringing the matter directly to the trial court rather than on direct appeal. *See id.* This is a case, however, where trial counsel had raised a question about appellant's possible insanity defense during trial and subsequently denied that appellant was insane, at odds with the trial court's assessment. Comprehensive information as to appellant's insanity was not revealed until sentencing and trial counsel may have been conflicted on whether to assert an insanity defense, precluding a timely motion for a new trial under Rule 33. *See* Super. Ct.Crim. R. 33 (2000) (providing for seven days within finding of guilty to file a

new trial motion other than one based on newly discovered evidence).

Appellate counsel could, and perhaps should, have filed a § 23–110 motion in order to bring the matter to the trial court. *See Doe v. United States,* 583 A.2d 670, 674 (D.C.1990) (explaining appellate counsel's responsibility to file appropriate § 23–110 motions). Appellant's motion for substitute counsel on appeal was denied by this court. Because the record suffices to remand for the trial court to conduct a *Frendak* inquiry, we need not address whether either trial or appellate counsel's failure to bring the matter to the trial court's attention at sentencing or post conviction would furnish independent grounds for relief.