*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 24-CF-0819

JAMES ALLEN CAMPBELL, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2023-CF3-004873)

(Hon. Jason Park, Trial Judge)

(Submitted February 12, 2026                    Decided March 12, 2026)

*Patricia Cresta-Savage* was on the briefs for appellant.

*Jeanine Ferris Pirro*, United States Attorney, and *Chrisellen R. Kolb*, *Nicholas P. Coleman*, *John Parron*, *Monisha Rao*, and *Michael E. McGovern*, Assistant United States Attorneys, were on the brief for appellee.

Before BECKWITH, EASTERLY, and SHANKER, *Associate Judges*.

SHANKER, *Associate Judge*: In July 2023, David Ryan was riding his bicycle in Northwest Washington, D.C., when he saw appellant James Allen Campbell on the side of the road near the sidewalk. Mr. Campbell appeared to be in distress, so Mr. Ryan approached him and asked if he needed help. In response, Mr. Campbell accosted Mr. Ryan and grabbed his bike. A struggle ensued in which Mr. Ryan used

his bike to fend off Mr. Campbell, Mr. Campbell stabbed Mr. Ryan with a knife, and both parties sustained injuries. Mr. Campbell was arrested and charged in connection with this incident, and, following a bench trial in Superior Court in which Mr. Campbell represented himself (with counsel on standby), he was convicted of assault with a dangerous weapon (the knife) (D.C. Code § 22-402) and assault causing significant bodily injury (D.C. Code § 22-404(a)(2)).

Mr. Campbell appeals his convictions, arguing that (1) the government presented insufficient evidence to refute his claim of self-defense and (2) the trial court abused its discretion by failing to conduct an inquiry under *Frendak v. United States*, 408 A.2d 364 (D.C. 1979), as to whether he was intelligently and voluntarily deciding to forgo an insanity defense. We conclude that the evidence was sufficient to disprove self-defense beyond a reasonable doubt but that the trial court erred by failing to conduct a *Frendak* inquiry. We therefore remand for the court to conduct that inquiry. *See Maziarz v. United States*, 312 A.3d 1234, 1244, 1246 (D.C. 2024).

## I.     Background

### A.     The Altercation

The evidence at trial included the following. In the early afternoon of June 19, 2023, Mr. Ryan was riding his bicycle near Washington Hospital Center and

Children's National Hospital in the District when he saw Mr. Campbell "on the sidewalk . . . almost falling in the street." Mr. Campbell "looked like he needed help"—he was "disheveled," appeared "unconscious," was "dozing, almost falling into the street," had "blood all over his face," and was rocking. Mr. Ryan approached Mr. Campbell and asked him if he needed help.

Mr. Campbell made an "ugly face" at Mr. Ryan and "got belligerent." Mr. Campbell asked, "Who are you[?] What are you doing here[?]" Mr. Ryan falsely told Mr. Campbell that he was a retired police officer in order to get Mr. Campbell to "calm down" and "not try to hurt" him. Mr. Campbell stood up and was "starting to get in [Mr. Ryan's] face" and putting his hands on Mr. Ryan's bike. Mr. Ryan used his bike to push Mr. Campbell back and then tried to leave on his bike, but Mr. Campbell went after Mr. Ryan again. Mr. Ryan then hit Mr. Campbell on the head with his bike, causing Mr. Campbell to bleed and further upsetting him.

After Mr. Ryan hit Mr. Campbell with the bike, Mr. Campbell reached into his pocket and pulled out a utility knife with a six-inch blade. Mr. Ryan again used his bike to create some space between him and Mr. Campbell, and the two ended up in a tussle. During the altercation, Mr. Campbell stabbed Mr. Ryan in the forearm with the knife, causing blood to "fiercely gush[ ]" from Mr. Ryan's arm. This

portion of the altercation was captured on a video taken by a bystander, which was presented at trial during Mr. Ryan's testimony.

Another passerby helped Mr. Ryan pry the knife from Mr. Campbell's hand and the passerby threw it over the guardrail of the road. Mr. Ryan went to the hospital, where he received four stitches on the inside and six stitches on the outside of his forearm.

Mr. Ryan acknowledged during cross-examination that he had testified before the grand jury that Mr. Campbell told him: "You hit me, you touched me, you can't do that, just leave me alone, get away." Mr. Ryan also agreed that he weighed more than 250 pounds and was larger than Mr. Campbell, that Mr. Campbell pulled out his knife after Mr. Ryan hit him with his bike, and that Mr. Campbell did not "physically touch" Mr. Ryan before Mr. Ryan struck Mr. Campbell with his bike.

A witness to the incident saw Mr. Campbell before the altercation with Mr. Ryan. Mr. Campbell appeared to be "in distress": his "eyes [were] rolling to the back of his head" and he was "rocking back and forth almost as if he was unconscious." The witness saw Mr. Ryan arrive and ask Mr. Campbell, in a non-

threatening and non-aggressive tone, if he needed help.[1]  Mr. Campbell then "popped up" and "reach[ed]" toward Mr. Ryan, like a "grab" with two hands.  "Eventually" it turned into a "tussle" over Mr. Ryan's bike, with both individuals "pulling to try to get the bike from the other person."  Mr. Ryan was "in retreat most of the time," but he then used his bike as a "weapon type of thing to get some distance" between him and Mr. Campbell and hit Mr. Campbell in the head in the process.  That's when "a knife came in play," with Mr. Campbell "swinging it" at Mr. Ryan while Mr. Ryan was "backing up," "[t]rying to avoid" the knife and "get away."  Mr. Campbell and Mr. Ryan "tussl[ed]" and "fell . . . onto the [guard]rail" and "onto [the] ground."  The witness did not see the stabbing but saw Mr. Ryan bleeding from his arm afterward.  The witness saw the bystander put his foot on Mr. Campbell's hand, which was holding the knife, and Mr. Ryan got away and rode his bike to the hospital.

A Metropolitan Police Department (MPD) officer who responded to the scene perceived that Mr. Campbell was in a "compromised mental status," was not "coherent," and "had an injury to his forehead."  Bystanders told the officer that Mr.

---

[1] Mr. Ryan had testified that he asked a woman passing by if she had any Narcan and that he and the woman together approached Mr. Campbell and asked him if he needed help.  The witness testified that he did not see that, and the trial court expressed skepticism about Mr. Ryan's testimony on that issue.

Campbell had been in an altercation with another person who had left the scene and that Mr. Campbell had stabbed that person.

Mr. Campbell testified in his defense (because he was representing himself, he presented "narrative" testimony). He stated that he was "minding [his] business" and, when he opened his eyes, he saw Mr. Ryan "standing there watching" him with a "weird look." Mr. Campbell asked Mr. Ryan to leave but Mr. Ryan did not, so Mr. Campbell stood up. Mr. Campbell grabbed Mr. Ryan's bike and pushed it back so that Mr. Ryan would leave him alone, but Mr. Ryan did not leave. The two tussled over the bike and Mr. Ryan hit Mr. Campbell in the head with it. Mr. Ryan then "thrust[ ]" Mr. Campbell backward over the guardrail and repeatedly swung at him.

Although Mr. Campbell had blood and dirt in his eyes and could barely see out of his right eye, he saw Mr. Ryan "going to the bike" again. Mr. Ryan, according to Mr. Campbell, had used his bike "as a weapon" and not as a "barrier," and Mr. Campbell did not want to get hit again, so he pulled out his knife "in an exaggerated motion" so that Mr. Ryan would get away from him. Mr. Ryan, however, "put the bike up" the same way he did before, so Mr. Campbell "jabbed [his] knife purposedly in [Mr. Ryan's] arm to drop the bike." Mr. Campbell stated that he "used just enough force to get that bike out of his hand" and "stabbed [Mr. Ryan] one time in self-defense." Mr. Campbell noted that after the knife was pried from his hand,

he had another knife on him (which an MPD officer found on his waist) but he did not continue to attack Mr. Ryan, demonstrating that his attack was "just enough to repel David Ryan from hitting me with that bike."

On cross-examination, Mr. Campbell testified that he had not ingested drugs on the day of the incident, that he was "clearly having a mental health episode" and "needed psychiatric help," and that he is a "paranoid schizophrenic" who "hear[s] things that[ are] not there sometimes." During cross-examination, the government played body-worn camera footage from an officer who engaged with Mr. Campbell after the incident. The footage shows Mr. Campbell wobbling and mumbling. Mr. Campbell testified that the video made it "clear" that he was having a "mental health episode." On redirect examination, Mr. Campbell added that he is a "bipolar schizophrenic" who had gone about fifty days without his medication and was "clearly having a mental health breakdown," and that his "mental state should have a role in here."

## B. The Trial Court's Ruling

The trial court found that the government had proven beyond a reasonable doubt all of the elements of both charged offenses. With respect to self-defense, the court set forth Mr. Ryan's and Mr. Campbell's competing accounts of the incident and observed that if those accounts were the only evidence in the case, "we might

be in a very different situation." The court, however, found the eyewitness to be an "important[ ]" and "very credible witness with a good recollection of what occurred" and a "clear vantage point as to what happened."

The trial court found that the eyewitness's testimony "corroborate[d] key portions" of Mr. Ryan's version of the incident. In particular, the witness testified that Mr. Ryan asked Mr. Campbell if he needed help in a "regular tone" that was not "threatening." That "belie[d] any notion" that Mr. Ryan intended to assault Mr. Campbell, at least when the two began interacting. In addition, the witness testified that Mr. Campbell "popped up" and that Mr. Ryan was "backing up" and was "in retreat." The trial court credited the witness's testimony that Mr. Ryan pushed his bike at Mr. Campbell only when he was "unable to retreat" and in order to get Mr. Campbell off of him. At that point, Mr. Campbell produced a knife and was swinging it, and, "critically" in the court's view, Mr. Ryan "was still trying to retreat." These facts, the court stated, "substantially undercut[ ]" Mr. Campbell's testimony that it was Mr. Ryan "who attacked him, who provoked this incident, who was the aggressor here."

The trial court also relied on the video of part of the incident. The court stated that although at the beginning of the video Mr. Ryan was on top of Mr. Campbell on the guardrail, Mr. Ryan then got off of Mr. Campbell and tried to get his bike and

back away, but Mr. Campbell walked toward him "swinging his knife." The video did not, the trial court noted, show Mr. Ryan using his bike as a weapon or swinging it in the way Mr. Campbell had claimed.

Finally, the trial court found Mr. Campbell's testimony not credible in certain respects. The court stated that his testimony was "not consistent with the video[ and] not consistent with the eyewitness'[s] testimony" and did "not corroborate his testimony of being struck multiple times with this bicycle."

Accordingly, the trial court concluded that the government had proved beyond a reasonable doubt that "Mr. Campbell had no reasonable grounds for any belief that he was in imminent danger of bodily harm"; that "even if he were . . . his use of force in stabbing" Mr. Ryan "was not a reasonable use of force under the circumstances"; and that "Mr. Campbell was the first aggressor, that there was no withdrawal, and that, therefore, he cannot avail himself of the right of self-defense." In sum, the government "prove[d] beyond a reasonable doubt . . . that Mr. Campbell was not acting in self-defense."

The trial court thus found Mr. Campbell guilty of assault with significant bodily injury and assault with a dangerous weapon. The court subsequently sentenced Mr. Campbell to forty-eight months of imprisonment to be followed by three years of supervised release. This appeal followed.

## II.    Analysis

Mr. Campbell argues that the government failed to prove beyond a reasonable doubt that he did not act in self-defense and that the trial court abused its discretion by failing to conduct a *Frendak* inquiry.  We disagree with the first claim but agree with the second.

### A.    The Sufficiency of the Evidence to Disprove Self-Defense

Mr. Campbell contends that the government failed to disprove self-defense beyond a reasonable doubt.  We conclude that the evidence is sufficient to support the trial court's verdict.

### 1.    *Standard of Review*

"Where evidence of self-defense is present, the government bears the burden of disproving self-defense beyond a reasonable doubt." *Millhausen v. United States*, 253 A.3d 565, 569 (D.C. 2021) (quoting *Rorie v. United States*, 882 A.2d 763, 776 (D.C. 2005)).  "We review a claim of insufficient evidence de novo, considering 'all the evidence in the light most favorable to the verdict and according deference to the factfinder to weigh the evidence, determine credibility, and draw justifiable inferences of fact.'" *Ross v. United States*, 331 A.3d 220, 224 (D.C. 2025) (quoting *Wicks v. United States*, 226 A.3d 743, 746-47 (D.C. 2020)) (citation modified).

"[W]here bench trials are concerned, we 'are deferential to the prerogatives and advantages of the trial judge' and 'will not disturb the trial judge's factual findings unless we can conclude they were plainly wrong or without evidence to support them.'" *Id.* (quoting *Augustin v. United States*, 240 A.3d 816, 824 (D.C. 2020)). "We affirm the trial court's judgment if '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *Rivas v. United States*, 783 A.2d 125, 134 (D.C. 2001) (en banc)). "But this review 'means more than that there must be some relevant evidence in the record in support of each essential element of the charged offense'; 'slight evidence is not sufficient evidence.'" *Id.* (quoting *Rivas*, 783 A.2d at 134) (citation modified).

## 2. *Discussion*

Because Mr. Campbell used nondeadly force against Mr. Ryan, the government had to disprove that Mr. Campbell actually and reasonably believed that he was facing imminent bodily harm. *See Parker v. United States*, 155 A.3d 835, 844-45 & n.16 (D.C. 2017); *Ewell v. United States*, 72 A.3d 127, 131-32 (D.C. 2013).

"If there is evidence that the defendant actually and reasonably believed herself to be in imminent danger of bodily harm—i.e., if the government cannot prove beyond a reasonable doubt that the defendant did not have such a belief—the

inquiry proceeds to the amount of force employed. A defendant may use 'only reasonable force to repel the perceived attack.'" *Parker*, 155 A.3d at 845 (quoting *Higgenbottom v. United States*, 923 A.2d 891, 900 (D.C. 2007)). "Or, rephrased in the context of the government's burden of proof, in a situation where the evidence establishes that self-defense would otherwise be justified, the government can rebut a self-defense claim only if it proves that a defendant used excessive force." *Id.* at 845-46 (citation modified). "But distinguishing what constitutes excessive force from a 'reasonable amount of force' is not a wholly objective inquiry; the factfinder must take into account evidence of the defendant's mental state under the circumstances." *Id.* at 846. "The question is thus whether the defendant's use of force is 'a proportionate reaction to the threat that he perceived' while in the heat of the moment." *Id.* (quoting *Ewell*, 72 A.3d at 130) (citation modified).

The evidence was sufficient to prove beyond a reasonable doubt that Mr. Campbell was not acting in self-defense when he stabbed Mr. Ryan. The evidence, including the testimony of the eyewitness and the video recording, supports the conclusion that, even if Mr. Campbell was caught off guard and fearful when he first saw Mr. Ryan and this justified his initial efforts to grab Mr. Ryan's bicycle and push him back, Mr. Ryan retreated and tried to leave on his bike, but Mr. Campbell came after Mr. Ryan while swinging the knife. The testimony and video support a finding that Mr. Ryan was backing up and trying to get away when Mr. Campbell

stabbed him. Accordingly, the evidence is sufficient to support a conclusion that Mr. Campbell did not reasonably believe himself to be in imminent danger of bodily harm when he pursued Mr. Ryan and stabbed him and that Mr. Campbell used excessive force to repel any threat that Mr. Campbell believed Mr. Ryan posed. *See Edwards v. United States*, 619 A.2d 33, 38 (D.C. 1993) ("Appellant's right of self-defense at the onset of the encounter did not survive [the complainant's] flight down the street. There was no evidence to suggest that appellant, who had locked himself inside his apartment and called the police, could reasonably have believed himself to be in danger from a fleeing man. Hence, his use of armed force was excessive and would defeat his self-defense claim.") (citation modified); *see also Ewell*, 72 A.3d at 132 (noting that the question was whether, "*when appellant struck* [the complainant], he reasonably believed that she posed an imminent threat of bodily harm") (emphasis added); *Freeman v. United States*, 912 A.2d 1213, 1220 (D.C. 2006) (holding evidence sufficient to disprove self-defense beyond a reasonable doubt where complainant was "backing up" from the defendant and "holding his hands in the air, 'nervous' and in fear").

We are not persuaded by Mr. Campbell's arguments to the contrary. He asserts that "there was some doubt about the government witness versions," but "inconsistencies generally affect only the weight of the evidence, not its sufficiency, and are in any event for the fact-finder to resolve." *Ransom v. United States*, 322

A.3d 521, 527 (D.C. 2024) (citation modified). "Factual findings anchored in credibility assessments derived from personal observations of the witnesses," moreover, "are beyond appellate reversal unless those factual findings are clearly erroneous." *Id.* (citation modified).

Mr. Campbell also alludes to a claim that the trial court abused its discretion by failing to consider his evidence of self-defense and by "not allow[ing a] perfect self defense instruction." That claim is both undeveloped, *see Comford v. United States*, 947 A.2d 1181, 1188 (D.C. 2008), and belied by the record: the trial court "instructed itself on the law of self-defense," *Parker*, 155 A.3d at 840 (citation modified); noted that the government bore the burden of proving beyond a reasonable doubt that Mr. Campbell did not act in self-defense; and recounted Mr. Campbell's testimony in support of his self-defense claim.

Finally, Mr. Campbell argues that the trial court abused its discretion by failing to consider his mental condition at the time of the offense and says that he "asserted a defense of 'imperfect' self-defense." But the trial court acknowledged Mr. Campbell's argument that "he was completely out of it at the time" and nonetheless concluded that the video and eyewitness's testimony undermined his version of events. We have, moreover, explained that imperfect self-defense "involves negating the malice required for a murder conviction but does not

necessarily involve a defendant's mental capacity," *Jackson v. United States*, 76 A.3d 920, 935-36 (D.C. 2013), and that "imperfect self-defense has nothing inherently to do with a defendant's capacity to form a particular mental state," *id.* at 936 n.9 (citation modified).

## B.    The Lack of a *Frendak* Inquiry

Mr. Campbell asserts that the trial court failed to conduct a sufficient inquiry as to whether he was intelligently and voluntarily waiving an insanity defense.  We conclude that the obligation to conduct a *Frendak* inquiry was triggered by the information before the trial court and that the court did not conduct the required inquiry.

### 1.    *Additional Background*

At Mr. Campbell's presentment, he was ordered detained pursuant to D.C. Code § 23-1322(b)(1)(A).  An initial assessment in connection with his admission to the central detention facility cleared him for housing in the open population.  The Department of Behavioral Health (DBH) subsequently assessed Mr. Campbell for his competency to stand trial.  The DBH report, discussed further below, noted that Mr. Campbell had a "history of treatment for serious mental illness" and "exhibited symptoms of mental illness" in the interview, and it concluded that further

evaluation was needed to determine his competency. The report also stated that Mr. Campbell did not know the meaning of the plea of not guilty by reason of insanity.

Following a full competency examination, DBH issued a second report in which it determined that Mr. Campbell was "currently competent to stand trial" while noting, among other things, that he had reported that he "hears voices which make him paranoid" and had been diagnosed with "Major Depressive Disorder, Recurrent, Severe with Psychotic Features and Phencyclidine-Induced Mood Disorder." This second report also observed that Mr. Campbell did not know the meaning of the insanity plea, but it reported that the plea was then "discussed." Based on the DBH report, the trial court found Mr. Campbell competent.

Next, at the preliminary hearing, also discussed more below, an MPD officer testified about his interaction with and the arrest of Mr. Campbell after the incident. The officer stated that Mr. Campbell had "an altered mental status," was "confused" and "speaking kind of incoherently," and "didn't seem to have a grasp of the situation."

Mr. Campbell subsequently sought to represent himself. The trial court ordered an evaluation of Mr. Campbell's competence to waive his right to counsel and, in a third report, DBH determined that Mr. Campbell was competent both to stand trial and to waive his right to counsel and represent himself. It observed,

however, that Mr. Campbell had a "history of depressive and bipolar-related diagnoses." This report represented that Mr. Campbell "explained the not guilty by reason of insanity plea (NGRI) as 'not competent at the time of the incident, you weren't yourself' and that someone found NGRI would be committed until they were 'found competent,'" and that "additional details of this plea were then discussed."

At a trial readiness hearing, Mr. Campbell renewed his request to represent himself but asked for his fourth appointed counsel to remain available in an advisory capacity. He also asked to waive his right to a jury and be tried in a bench trial. The trial court scheduled a hearing to determine whether Mr. Campbell was capable of a knowing and voluntary waiver of his rights to counsel and a jury trial.

At the hearing, the trial court engaged Mr. Campbell in a colloquy about his educational background; his mental health and present mental state; and his understanding of his rights, the elements of his charges, his potential defenses, the potential sentences for his charges, the benefits of having a lawyer, the disadvantages of representing himself, and the standard to which his trial conduct would be held. In an ex parte bench conference during the hearing, the court asked Mr. Campbell if he understood "the possible legal defenses to the charges" he faced. Mr. Campbell said "Yes," and when asked to name some of those potential defenses, he answered, "They got mental health disease which would be like an insanity plea. They have

self-defense in its various forms . . . ." The trial court then asked Mr. Campbell if he had decided what defense he was going to raise at trial, and Mr. Campbell said yes, but the court said that Mr. Campbell did not have to reveal that defense. At the conclusion of the colloquy, the trial court found that Mr. Campbell was "knowingly, intelligently, and voluntarily waiving his right to counsel" and had "the necessary understanding of the factual and legal proceedings to be able to do so." Following an additional colloquy, the trial court found that Mr. Campbell was also knowingly and voluntarily waiving his right to a jury trial.

### 2. *Standard of Review*

"We review the trial judge's failure to conduct a *Frendak* inquiry for abuse of discretion." *Maziarz*, 312 A.3d at 1241 (citing *Patton v. United States*, 782 A.2d 305, 312 (D.C. 2001)). Necessarily, "a court abuses its discretion when it makes an error of law." *Id.* (citation modified).

### 3. *Discussion*

In *Frendak*, we held that "whenever the evidence suggests a substantial question of the defendant's sanity at the time of the crime, the trial judge must conduct an inquiry designed to assure that the defendant has been fully informed of the alternatives available, comprehends the consequences of failing to assert the

[insanity] defense, and freely chooses to raise or waive the defense." 408 A.2d at 380; *see Maziarz*, 312 A.3d at 1241. We observed that "the scope of the inquiry for this determination will vary according to the circumstances present in each case, especially in relation to the background and condition of the defendant," *Frendak*, 408 A.2d at 380, but we deemed it "important to note" that "because the court is dealing with an individual whose sanity has been questioned, a cursory explanation or a rote interrogation cannot satisfy the court's duty," *id.*

"To establish a *prima facie* case of insanity, the defendant must present sufficient evidence to show that at the time of the criminal conduct, as a result of mental disease or defect, he lacked substantial capacity to recognize the wrongfulness of his act or to conform his conduct to the requirements of the law." *Howard v. United States*, 954 A.2d 415, 420 (D.C. 2008) (citation modified). "The existence of mental illness alone does not suffice, as a defendant must establish a causal relationship between the criminal conduct and his mental disease." *Id.* (citation modified). But "the strength of the individual's potential insanity defense should not be a factor in the court's decision, except to the extent that such evidence is useful in determining whether the defendant presently is capable of rationally deciding to reject the defense." *Frendak*, 408 A.2d at 380-81.

The first question before us is whether the obligation to conduct a *Frendak* inquiry was triggered. We conclude that it was. The Department of Behavioral Health competency examination reports that were before the trial court stated, among other things, that Mr. Campbell had been diagnosed with multiple mental illnesses, including bipolar disorder and recurrent, severe major depressive disorder with psychotic features; that he had a "history of treatment for serious mental illness" and in the first examination continued to "exhibit[ ] symptoms of mental illness"; and that he reported "hear[ing] voices which make him paranoid." At the preliminary hearing, a police officer who had responded to the scene testified that Mr. Campbell displayed an "altered mental status"; was not engaging in "orthodox" or "normal" behavior; "really couldn't answer very well what was going on"; was "mumbling" and "speaking kind of incoherently"; and "didn't seem to have a grasp of the situation." The video of an officer speaking to Mr. Campbell after the incident supports those descriptions.

These facts certainly raised a "substantial question," *id.* at 380, about Mr. Campbell's sanity—that is, a question whether, due to a mental disease, he lacked substantial capacity to recognize the wrongfulness of his act or to conform his conduct to the requirements of the law—at the time of the offense.

Even if a *Frendak* inquiry was not triggered before trial, it was triggered during Mr. Campbell's cross-examination and redirect testimony, when he repeatedly asserted that he was having a "mental health episode" and a "mental health breakdown" at the time of the offense; that at the time of the offense he "needed psychiatric attention" and "psychiatric help"; that he is a "paranoid schizophrenic" and a "bipolar schizophrenic" who "might go in and out," "hear things that's not there sometimes," and "hear things and see things"; and that at the time of the offense he had gone without his medication for about fifty days. Indeed, the government asked Mr. Campbell whether he agreed that the videos played at trial showed that he was "not clearly there in the present" and "kind of out of it." Mr. Campbell answered "yes" to those questions.

Mr. Campbell, moreover, expressly asserted that his "mental state should have a role in here." At that point, it was evident that Mr. Campbell believed that his mental state at the time of the offense provided a defense. That obligated the trial court to inquire whether Mr. Campbell was intelligently and voluntarily waiving an insanity defense. *See id.* (trial court must conduct the inquiry "whenever the evidence suggests a substantial question of the defendant's sanity at the time of the crime"); *see also Maziarz*, 312 A.3d at 1243 ("The absence of record facts indicating insanity until critical moments in a trial does not absolve the trial court of the responsibility to conduct a *Frendak* inquiry."); *Phenis v. United States*, 909 A.2d

138, 156-58 (D.C. 2006) (stating that evidence presented post-trial and at sentencing "should have alerted the trial judge to the need to conduct a *Frendak* inquiry"); *Patton*, 782 A.2d at 314 (stating that trial court's *Frendak* obligation can arise any time during the proceedings, including after trial and at sentencing).

The record does not support the government's claim that there were "conflicting signals" about Mr. Campbell's sanity at the time of the offense. All of the relevant evidence indicates that Mr. Campbell has a history of severe mental illness and at the time of the offense was in distress and incoherent, possibly unconscious, and in an altered mental state. This includes evidence from before trial—the DBH reports and the preliminary hearing testimony—and at trial—the testimony of Mr. Ryan, the eyewitness, the responding officer, and Mr. Campbell, and the video of Mr. Campbell's interaction with police immediately after the incident. The evidence to which the government refers relates to later points in time, which can be relevant to a *Frendak* analysis, *see Briggs v. United States*, 525 A.2d 583, 593 (D.C. 1987), but cannot by itself counter clear indications that at an earlier time the defendant was not sane.[2] *See Gorbey v. United States*, 54 A.3d 668, 693

---

[2] The government cites the trial court's findings that Mr. Campbell "was able to answer the questions of the police officer" and had an "awareness of his surroundings" immediately after the incident. Without suggesting that these findings are clearly erroneous, we note that the responding officer testified at the

(D.C. 2012) (observing that competence to stand trial is separate from the question whether the defendant has made an intelligent and voluntary decision to forgo insanity defense).  It makes sense that indications of a defendant's insanity before or during trial might support a determination of insanity *earlier*, at the time of the offense; but *sanity* at a *later* time, after the offense, has significantly less bearing on whether the defendant was *insane* earlier.  That is especially so here, where the DBH reports noted that at the time of the evaluations Mr. Campbell was taking medication and receiving psychiatric treatment, whereas Mr. Campbell testified that at the time of the offense he had been off of his medication for about fifty days.

Having concluded that the trial court's *Frendak* obligation was triggered, the second question is whether the court conducted a *Frendak* inquiry, or at least a sufficient *Frendak* inquiry given the circumstances of this case.  We conclude that the trial court did not.  As noted above, in a pretrial status hearing, when Mr. Campbell was representing himself, the court asked Mr. Campbell if he understood

preliminary hearing that Mr. Campbell had an "altered mental status," was incoherent, did not have a "grasp of the situation," and was "confused"; the same officer testified at trial that Mr. Campbell was incoherent; and the body-worn camera footage shows Mr. Campbell wobbling and mumbling indecipherably. *See Hawkins v. United States*, 248 A.3d 125, 130 (D.C. 2021) (noting our obligation to conscientiously review the record, including video footage, although that obligation neither makes us finders of fact nor changes our standard of review).  Any ability to answer questions or awareness of his surroundings that Mr. Campbell displayed does not, in our view, countervail the evidence raising a substantial question regarding his sanity at the time of the crime.

"the possible legal defenses to the charges" he faced. Mr. Campbell said "Yes," and when asked to name some of those potential defenses, he answered, "They got mental health disease which would be like an insanity plea. They have self-defense in its various forms . . . ." The trial court then asked Mr. Campbell if he had decided what defense he was going to raise at trial, and Mr. Campbell responded in the affirmative, but the court expressly told Mr. Campbell that it was not asking him to reveal his selected theory of defense.

The record thus arguably suggests that Mr. Campbell was aware that there is such a thing as an insanity defense and chose not to assert it. The record does not, however, provide any basis to conclude that Mr. Campbell understood or was informed by the court what it would mean to assert an insanity defense or the consequences of failing to assert the defense. *See Maziarz*, 312 A.3d at 1241 ("The court must make specific findings as to whether the defendant has made an intelligent and voluntary decision on whether to raise or waive the defense.") (citation modified); *Gorbey*, 54 A.3d at 693 (holding that the trial court "did not conduct the inquiry that *Frendak* envisions" where "the court did no more than confirm that appellant was, in fact, waiving the insanity defense"); *Phenis*, 909 A.2d at 155 (noting that *Frendak* is concerned with the defendant's "capacity at the time of trial to recognize the availability of the defense and whatever advantages—as well as disadvantages—it may offer to defendant's case"). This is especially so because

Mr. Campbell was representing himself and thus did not have the benefit of advice by counsel with respect to any decision to waive an insanity defense. *Cf. Phenis*, 909 A.2d at 159 ("It can be difficult to ascertain, without inquiry, whether there is merely a disagreement after the defendant has been fully advised, whether defendant is ill-informed, or whether counsel is conflicted between loyalty to her client's objective and counsel's own, contrary advice.") (citation modified). Moreover, regardless of what had transpired earlier in the proceedings, Mr. Campbell's assertion on redirect examination that his "mental state should have a role in here," in combination with substantial evidence that Mr. Campbell was suffering a mental health event at the time of the offense, called for a more robust determination at that point whether Mr. Campbell was seeking to raise an insanity defense.

We are not persuaded by the government's argument that the trial court conducted a sufficient *Frendak* inquiry because it was able to consider the DBH competency examination reports that touched on Mr. Campbell's knowledge of the insanity defense and other available pleas. For one thing, nothing that we see in those reports supports a conclusion that Mr. Campbell comprehended the consequences of failing to assert an insanity defense and was freely choosing to waive the defense. Moreover, the duty to conduct a *Frendak* inquiry falls on the court and we have said that the court must make "specific findings as to whether the defendant has made an intelligent and voluntary decision on whether to raise or

waive the defense." *Maziarz*, 312 A.3d at 1241. The examination reports' cursory references to "discuss[ions]" about the insanity plea by a clinical psychologist cannot satisfy the court's obligation to conduct a *Frendak* inquiry where such an inquiry is warranted.

Accordingly, we conclude that the trial court erred by failing to conduct a *Frendak* inquiry and we remand for the court to conduct that inquiry. *See Maziarz*, 312 A.3d at 1244, 1246; *Briggs*, 525 A.2d at 594-95. Focusing on the facts of this case, *see Frendak*, 408 A.2d at 380; *see also Phenis*, 909 A.2d at 159 n.20, the court must "ascertain" whether Mr. Campbell "was advised about" and made a voluntary and intelligent decision at the time of trial to waive an insanity defense. *Phenis*, 909 A.2d at 159. If so, his convictions will stand. But if the court concludes that Mr. Campbell did not make a voluntary and intelligent waiver of the insanity defense, then the court shall determine whether he now wishes to waive the insanity defense.

If Mr. Campbell voluntarily and intelligently wishes to waive the defense, his convictions will stand. If Mr. Campbell does not want to waive the defense, or the court determines that he is incapable of making a voluntary and intelligent waiver of the defense, the court shall order a productivity or psychiatric examination to obtain an evidentiary basis to determine whether there is sufficient evidence for an insanity defense.

If Mr. Campbell cooperates with the examination, and the court concludes that there is sufficient evidence that he may have been insane at the time of the offense, his convictions will be vacated and the trial court shall order a new insanity phase of the trial (which is to be a jury trial unless Mr. Campbell expressly waives his right). If Mr. Campbell cooperates with the examination and the court concludes that there is insufficient evidence to raise an issue of insanity, his convictions will stand. If Mr. Campbell does not cooperate with the examination, the court shall make an evidentiary determination based on other evidence in the record.

### III.   Conclusion

For the foregoing reasons, we remand for a *Frendak* inquiry according to the procedure as laid out in this opinion.

*So ordered*.